## LYNCH, EXECUTRIX OF LYNCH, COLLECTOR OF INTERNAL REVENUE, DECEASED, *v.* TILDEN PRODUCE COMPANY.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 139. Argued January 25, 1924.—Decided May 26, 1924.

1. The Act of May 9, 1902, c. 784, § 4, 32 Stat. 193, defines adulterated butter, in part, as " any butter in the manufacture or manipulation of which any process or material is used with intent or effect of causing the absorption of abnormal quantities of water, milk, or cream." *Held:*
(a) That the mere fact that butter contains 16% or more of moisture does not bring it within the statutory definition. P. 320.
(b) A regulation made by the Commissioner of Internal Revenue and approved by the Secretary of the Treasury declaring that any butter having 16% or more of moisture is adulterated, conflicts with the above statutory definition, and is void. *Id.*
2. Section 20 of the Act of August 2, 1886, c. 840, 24 Stat. 212, which empowered the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, to make all needful rules and regulations for the carrying of that act into effect, was made applicable, by the above Act of 1902, to manufacturers of "adulterated butter," only in respect of the marking, branding, identification and regulation of exportation and importation. P. 321.
3. Rev. Stats., § 251, authorizing the Secretary of the Treasury to prescribe rules and regulations not inconsistent with law to be used under and in the execution and enforcement of the internal revenue laws, does not sustain a regulation defining " adulterated butter " which eliminates conditions, words and phrases contained in the statutory definition, and substitutes others. P. 321.
282 Fed. 54, affirmed.

CERTIORARI to a judgment of the Circuit Court of Appeals affirming a judgment of the District Court for the

present respondent, in its action to recover an amount it was compelled to pay the Collector as stamp taxes, on butter seized by the Commissioner of Internal Revenue.

*Mrs. Mabel Walker Willebrandt,* Assistant Attorney General, with whom *Mr. Solicitor General Beck* was on the brief, for petitioner.

It was error for the appellate court to construe the word " effect" as necessarily proceeding from a rational agent. The mental element can be wholly lacking.

Congress in using these words obviously intended to cover two phases of operation in connection with the manufacture of adulterated butter, to wit: (a) Where the law is violated by intent or design, and (b) where the law is violated as a result of carelessness, ignorance, or greed. The purpose of the law is to prevent deception and to insure that a buyer will get value for money spent.

When it is shown that butter offered for sale is found to contain 16 per cent. or more of moisture, a greater moisture content than is found to be the average water content, this indicates that in the manufacture or manipulation of the butter some process or material is used with the intent or the effect of causing it to absorb an abnormal quantity of moisture. It is just as much a violation of the law for the butter-maker to fail to manipulate the butter sufficiently after many washings and thereby leave an excessive moisture content in the product which he offers for sale as it is for him cunningly to devise and use a process to inject undue moisture into the butter.

Congress has delegated the power to make Regulation No. 9 by express enactment. Act of May 9, 1902; Act of August 2, 1886; Rev. Stats., §§ 251, 3447. It is well

established that Congress can submit the decision of contested matters of fact, on the determination of which hinges the application of the law, to an administrative official, and Congress has the power to make such administrative official's decision thereon final. *Fong Yue Ting v. United States,* 149 U. S. 698; *Buttfield* v. *Stranahan,* 192 U. S. 470; *Union Bridge Co.* v. *United States,* 204 U. S. 364.

In the absence of express delegation, that authority by necessary implication has been delegated. *United States* v. *Bailey,* 9 Pet. 238; *Coopersville Creamery Co.* v. *Lemon,* 163 Fed. 145.

In declaring that 16 per cent. of moisture in butter is an abnormal quantity, the Commissioner of Internal Revenue did no more than to state and establish a scientific fact concurred in by the Departments of Agriculture and Treasury.

Congress specifically provided that the Commissioner's finding on a question of fact on matters of taxation under the Adulterated Butter Act is final. Act of 1886, § 14, incorporated in Act of 1902.

Conceding that Regulation No. 9 is not a conclusive determination of what constitutes an abnormal moisture in butter, the question of fact should have been submitted to the jury.

*Mr. George W. Peterson,* with whom *Mr. William H. Oppenheimer, Mr. Frederick N. Dickson* and *Mr. Frank C. Hodgson* were on the brief, for respondent.

MR. JUSTICE BUTLER delivered the opinion of the Court.

This action was brought in the United States District Court for Minnesota by the Tilden Produce Company against petitioner's testator, E. J. Lynch, Collector of Internal Revenue for the District of Minnesota, to recover

$936 stamp taxes, which it was compelled to pay on 9360 pounds of butter seized as adulterated by the Commissioner of Internal Revenue. At the trial, a verdict was directed in favor of the company, and judgment was entered for the amount paid with interest. The Circuit Court of Appeals affirmed the judgment. 282 Fed. 54. The case is here on certiorari under § 240 of the Judicial Code. 260 U. S. 718.

The question for decision is whether the butter was adulterated within the meaning of the Act of May 9, 1902, c. 784, 32 Stat. 193.

In 1918, the company manufactured in its creamery at Saint Paul, 350 tubs of butter, which it shipped to Chicago. At the time it was made, the company tested the butter and found the moisture content to range between 15 and 16 per cent., and the average to be 15.68 per cent. Samples were taken at Chicago, and tested under the direction of the Commissioner of Internal Revenue. It was found that the moisture content of the butter in 156 tubs was 16 per cent. or more, that the range was between 16 and 17.93 per cent., and that the average was 16.76 per cent. The butter was made by the company by methods generally followed in the manufacture of butter in creameries. It was shown by the evidence that the moisture content in butter varies greatly; that the variation ranges from 9 to over 20 per cent., and that there is no fixed standard. The moisture content of milk is over 90 per cent. and of cream over 60 per cent. The making of butter involves the segregation of the fat and the elimination of water. After churning and draining off buttermilk, it is the general practice of buttermakers to use water to wash out curd and liquids remaining in association with the butter. While some of the water used for that purpose may remain, washing usually lessens the total moisture. Within certain limits, buttermakers are able to control water content. It is tested while the butter

is in the churn. It may be reduced by manipulation, or water may be incorporated into or mixed with the butter so as to increase the water content, by working the butter under conditions calculated to accomplish that purpose. In practice, makers sometimes reduce or increase moisture content in order to meet competition in the market.

Adulterated butter, as defined by § 4 of the Act of May 9, 1902, includes: (1) a grade produced by treatment of different lots of butter to which a chemical or other substance is added to deodorize it or to remove rancidity; (2) a butter product with which is mixed a foreign substance to lessen its cost; and (3) "any butter in the manufacture or manipulation of which any process or material is used with intent or effect of causing the absorption of abnormal quantities of water, milk, or cream."

In 1907, the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, promulgated Regulations No. 9, which contain the following: "Adulterated Butter Defined: The definition of adulterated butter as contained in the act of May 9, 1902, embraces butter in the manufacture of which any process or material is used whereby the product is made to 'contain abnormal quantities of water, milk or cream,' but the normal content of moisture permissible is not fixed by the act. This being the case it becomes necessary to adopt a standard for moisture in butter, which shall in effect represent the normal quantity. It is therefore held that butter having 16 per cent. or more of moisture contains an abnormal quantity and is classed as adulterated butter."

Petitioner contends that the promulgation of this regulation is authorized by § 20 of the Act of August 2, 1886, c. 840, 24 Stat. 209, 212, and Rev. Stats., § 251. It is provided by § 20 that, "the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may make all needful regulations for the carrying into effect of this act." To a limited extent, this section

was made applicable to the Act of May 9, 1902, by § 4 thereof, which provides that it " shall apply to manufacturers of 'adulterated butter' to an extent necessary to enforce the marking, branding, identification, and regulation of the exportation and importation of adulterated butter." Revised Statutes, § 251, authorizes the Secretary of the Treasury to " prescribe . . . rules and regulations, not inconsistent with law, to be used under and in the execution and enforcement of the various provisions of the internal-revenue laws;" and to " give such directions to collectors and prescribe such rules . . . as may be necessary for the proper execution of the law; . . ."

The mere fact that the butter contains 16 per cent. or more of moisture does not bring it within the terms of the statutory definition of adulterated butter. Under the definition in § 4, there must be something in the manufacture or manipulation of the butter causing the absorption of abnormal quantities of water, milk or cream. This must result from the use of some material or process. The use must be with intent to cause such absorption, or must be calculated to produce that result. "Absorption" should be read to include the introduction of moisture from the outside and the incorporation of water into the butter, whether it is technically an absorption or not. Obviously, it does not include moisture originally contained in the cream or butter. The act does not prescribe the amount of moisture permissible or fix any rule or criterion by which to determine the amount that is deemed " abnormal " or that lawfully may be absorbed and incorporated.

The regulation makes water content the sole test of adulteration, without regard to other provisions of the act. In support of its validity, it is said that, in declaring 16 per cent. of moisture in butter is abnormal, the regulation does no more than to establish a scientific fact. But

it goes beyond that, and declares such butter to be adulterated. It omits essential elements of the statutory definition: namely, the use of a process or material in the manufacture of the butter, and the causing of absorption,—i. e., the incorporation or taking in from the outside,—of abnormal quantities of moisture.

Congress has not delegated power or authority to make such a regulation. Section 20 of the Act of August 2, 1886, does not apply. It is made applicable only in respect of the marking, branding, identification and regulation of exportation and importation of adulterated butter; it does not authorize a regulation establishing what shall be deemed to constitute excessive moisture or the "absorption of abnormal quantities of water, milk, or cream"; it grants no power to add to or take from the statutory definition of adulterated butter. Section 251 of the Revised Statutes confers upon the Secretary of the Treasury authority to make certain rules and regulations, but it grants no power to the Commissioner of Internal Revenue alone. To make any regulation by him on the subject effective, it must be approved by the Secretary, in which event it really becomes a regulation of the latter. Moreover, the rules and regulations authorized by § 251 are required to be "not inconsistent with law." The regulation prescribes a standard which Congress has not authorized the Commissioner or the Secretary to fix. It sets up a definition of adulterated butter which conflicts with that contained in the act. The two cannot be read in harmony. If given effect, the regulation would eliminate from the definition of adulterated butter the conditions specified in the act and strike out words and phrases and substitute others for them. In effect, it would depart from and put aside the statutory definition. In some of the lower courts the regulation has been held invalid. *United States* v. *11,150 Pounds of Butter,* 195 Fed. 657, affirming 188 Fed. 157; *Baldwin Co-operative Creamery Association* v.

*Williams,* 233 Fed. 607; *Henningsen Produce Co.* v. *Whaley,* 238 Fed. 650. But in *Coopersville Co-operative Creamery Co.* v. *Lemon,* 163 Fed. 145, it was held valid. We think that decision fails to take into account and give proper weight to the conflict between the act and the regulation. See *Field* v. *Clark,* 143 U. S. 649; *United States* v. *Eaton,* 144 U. S. 677; *In re Kollock,* 165 U. S. 526; *Buttfield* v. *Stranahan,* 192 U. S. 470; *Williamson* v. *United States,* 207 U. S. 425; *United States* v. *Grimaud,* 220 U. S. 506. It must he held that the regulation is invalid.

The act does not prescribe any standard for moisture in butter. In its manufacture, the variation of moisture ranges above as well as below the quantities found in the butter in question, and its moisture content cannot be said to be " abnormal ". It was made in the usual way. There was no process or material used with intent or effect of causing absorption of abnormal quantities of moisture. It was not adulterated within the meaning of the act.

*Judgment affirmed.*