## SAWYER v. UNITED STATES.

(Circuit Court of Appeals, Second Circuit. January 4, 1926.)

No. 22.

1. **United States ⊜40—"Regulation" of executive department, authorized by act of Congress, has force of law.**

"Regulation" of executive department, authorized by an act of Congress, gives department power to adopt general rules relating to the subject on which the department acts, made by the head of the department, thereby giving to regulation adopted the force of law.

2. **United States ⊜40—Authority to make regulations to carry out legislative act confers no authority to change the act.**

Authority to make rules and regulations necessary for carrying out the purposes of a legislative act can confer no authority to change the act itself, and thereby deprive one of a right given by the act.

3. **Constitutional law ⊜60—Congress cannot delegate legislative power.**

Congress cannot delegate legislative power.

4. **Constitutional law ⊜62—Authority to make administrative rules is not delegation of legislative power.**

Authority to make administrative rules is not a delegation of legislative power.

5. **Army and navy ⊜23—"Retainer pay" is compensation to enlisted men not rendering active service; "allowance;" "gratuity."**

As Act establishing the Naval Reserve Force (Comp. St. § 2900½a et seq.) does not use the words "allowances" or "gratuities" as synonymous with "retainer pay," "retainer pay" is the compensation paid to enlisted men retained in the service, but not rendering active service, although liable to be called into active service, and when called they no longer receive "retainer pay," but pay; term "allowance" meaning a gift or a "gratuity."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Allowance; Gratuity.]

6. **Army and navy ⊜51½, New, vol. 12A Key-No. Series—Regulations of Director of Bureau of War Risk Insurance held to have force of law.**

Under Act Oct. 6, 1917 (Comp. St. 1918, §§ 514k–514vv), Act Sept. 2, 1914 (Comp. St. §§ 514a–514vv), and Act Aug. 29, 1916 (Comp. St. § 2900½a et seq.), Director of Bureau of War Risk Insurance was empowered to make rules and regulations necessary to carry out its purposes, regulation of July 25, 1919, regulation No. 40, and regulation known as "Form 2303," as to payments of premiums on insurance, *held* validly adopted, and to have force of law.

**7. Army and navy ⬾51½, New, vol. 12A Key-No. Series—Failure to send check for insurance premium held to forfeit policy.**

Where, in written agreement between member of active naval force and the United States, it was expressly stated that all regulations under the War Risk Insurance Act (Comp. St. §§ 514a–514vv) in force or hereafter adopted should constitute the contract, after retirement from active service, applicant could no longer demand that the United States deduct from his retainer pay as a member of the naval reserves monthly premium due on his policy, it becoming, by regulation known as "Form 2303" of Bureau of War Risk Insurance, his duty to send check to the bureau, and, failing to do so, his policy lapsed.

Manton, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Southern District of New York.

Action by Georgie E. Sawyer against the United States. Complaint was dismissed, and plaintiff brings error. Affirmed.

August Emerson enlisted on January 22, 1918, for a term of four years in the United States Naval Reserve Force. He continued in the active service of that force down to the time of his honorable discharge therefrom on October 31, 1919, and on October 1, 1919, he was confirmed as a lieutenant in that force. He continued as a member of the United States Naval Reserve Force in inactive service down to the date of his death, which occurred on July 2, 1920.

On October 8, 1918, he being at the time a member of and engaged in the active service of the Navy of the United States, Emerson made application for insurance as provided in the War Risk Insurance Act. The amount of insurance applied for was $10,000, payable as provided in the act, to himself in case of total permanent disability, and upon and after his death to his sister, who is the plaintiff herein.

Emerson having died, this suit is brought by the plaintiff to recover the amount of the policy. A demurrer to the complaint was filed, and the complaint was dismissed.

Harry C. Barker, of Poughkeepsie, N. Y. (S. S. Ashbaugh and M. M. Ashbaugh, both of Washington, D. C., of counsel), for plaintiff in error.

Emory R. Buckner, U. S. Atty., of New York City (John M. Ryan, Asst. U. S. Atty., of New York City, and L. A. Lawlor, Associate Counsel, U. S. Veterans' Bureau, of Washington, D. C., of counsel), for the United States.

10 F.(2d)—27

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This is an action brought by the plaintiff to recover on a certificate of insurance, in the sum of $10,000, issued to her brother, August Emerson, pursuant to the provisions of the War Risk Insurance Act of October 6, 1917, 40 Stat. pt. 1, p. 398, c. 105 (Comp. St. 1918, §§ 514k–514vv).

The Bureau of War Risk Insurance was established by the Act of September 2, 1914, 38 Stat. c. 293, p. 711 (Comp. St. §§ 514a–514vv). That act was confined to the insurance of American vessels and their cargoes against the risks of war. And the Act of October 6, 1917, extended war risk insurance and provided for the insurance of seamen and for those in the military and naval service. 40 Stat. pt. 1, c. 105, p. 398.

The Act of 1917, p. 399, adding section 13 to Act Sept. 2, 1914 (Comp. St. 1918, § 514kk), provided that the Director of the Bureau of War Risk Insurance, subject to the general direction of the Secretary of the Treasury, should have full power and authority to make rules and regulations not inconsistent with the provisions of the act and necessary or appropriate to carry out its purposes. It also gave him authority to decide all questions arising under the act, except as otherwise provided in sections 5 (Comp. St. § 514e) and 405. Section 5 we are not concerned with in this case. Section 405, 40 Stat. p. 410, provides:

"That in the event of disagreement as to a claim under the contract of insurance between the bureau and any beneficiary or beneficiaries thereunder, an action on the claim may be brought against the United States in the District Court of the United States in and for the district in which such beneficiaries or any one of them resides. The court, as part of its judgment, shall determine and allow such reasonable attorney's fees, not to exceed ten per centum of the amount recovered, to be paid by the claimant on behalf of whom such proceedings are instituted to his attorney; and it shall be unlawful for the attorney or for any other person acting as claim agent or otherwise to ask for, contract for, or receive any other compensation because of such action. ＊ ＊ ＊ ＂

This Act of October 6, 1917, was amended by the Act of May 20, 1918, and it provided that an action on a war risk insurance claim might be brought against the United

States in the District Court of the United States in and for the district in which the beneficiaries or any one of them resides, and whenever judgment was rendered the court should determine and allow such reasonable attorney's fees, not to exceed *five* per centum of the amount recovered, to be paid by the claimant, in behalf of whom such proceedings were instituted, to his attorney. And it further provided that any person who directly or indirectly solicited, contracted for, charged, or received any fee or compensation except as provided for in the act, or who attempted so to do, should be guilty of a misdemeanor and for each and every offense should be punishable by a fine of not more than $500, or by imprisonment at hard labor for not more than two years, or by both such fine and imprisonment. 40 Stat. c. 77, p. 555 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 514kk).

This suit is brought under the authority of section 13 of the act of 1917, as amended by the act of 1918.

The Act of August 29, 1916, 39 Stat. c. 417, p. 587 (Comp. St. § 2900½a et seq.), established the Naval Reserve Force. It enacted:

"The Naval Reserve Force shall be composed of citizens of the United States who, by enrolling under regulations prescribed by the Secretary of the Navy or by transfer thereto as in this act provided, obligate themselves to serve in the Navy in time of war or during the existence of a national emergency, declared by the President: Provided, that citizens of the insular possessions of the United States may enroll in the Naval Auxiliary Reserve."

And it provides that "members of the Naval Reserve Force may be ordered into active service in the Navy by the President in time of war or when, in his opinion, a national emergency exists." It prescribes the amount of "retainer pay" which the members of the force shall receive, and that "retainer pay shall be paid annually or at shorter intervals, as the Secretary of the Navy, in his discretion, may direct." And it also provides that "all members of the Naval Reserve Force shall, when actively employed as set forth in this act, be entitled to the same pay, allowances, gratuities, and other emoluments as officers and enlisted men of the naval service on active duty of corresponding rank or rating and of the same length of service."

The Act of August 29, 1916, making appropriations for the Naval Service, provided that those who may be commissioned after they have established their qualifications to the satisfaction of the Secretary of the Navy "shall not be deprived of the retainer pay, allowances, or gratuities" to which they would be otherwise entitled. The act also provided that men in the Naval Reserve Force, upon completing 30 years service, including naval and fleet naval reserve service, may upon their own request be placed on the retired list of the Navy, "with the pay they were then receiving plus the allowances to which enlisted men of the same rating are entitled on retirement after thirty years' naval service." Comp. St. § 2900½b(9). And it further provided that the Secretary of the Navy in time of war or when a national emergency exists is authorized to call any enlisted man on the retired list into active service, and that when so employed the man shall receive "the same pay and allowances as he was receiving when placed on the retired list." Then it is further provided that "the annual retainer pay" of members of the Naval Reserve, after confirmation in rank or rating, "shall be two months' base pay of the corresponding rank or rating in the Navy." 39 Stat. c. 417, p. 591 (Comp. St. § 2900½c[4]).

The same act prescribing the amount of "pay" to be paid to men enrolled in the Fleet Naval Reserve declares "such pay" is "to be considered as retainer pay" for the obligation on the part of such members to serve in the Navy in time of war or national emergency. 39 Stat. c. 417, p. 590 (Comp. St. § 2900½b[4]).

Emerson, on January 9, 1918, enlisted in the United States Naval Reserve Force for a term of four years, and he continued in the active service of the Naval Reserve Force down to October 31, 1919, when he was honorably discharged therefrom, and from that time to the date of his death he continued a member of that force in inactive service. In his application for insurance Emerson stated:

"I hereby apply for insurance in the sum of $10,000 payable as provided in the War Risk Insurance Act, to myself during total permanent disability and from and after my death to the following persons in the following amounts."

He named his sister, Georgie E. Sawyer, plaintiff herein, as the beneficiary, and she was the sole beneficiary named. He concluded his application with the following statement:

"I authorize the necessary monthly deduction from my pay, or, if insufficient, from

any deposit with the United States, in payment of the premiums as they become due, unless they be otherwise paid.

"I offer this application, and it is to be deemed made, as of the date of signature, with premiums commencing from that date and payable at the end of each calendar month, beginning with the month in which application is made."

The Secretary of the Treasury issued to him the following certificate, being certificate No. 4711260:

"Date insurance effective—Oct. 8, 1918.

"This certifies that August Emerson has applied for insurance in the amount of $10,-000, payable in case of death or total permanent disability in monthly installments of $57.50.

"Subject to the payment of the premiums required, this insurance is granted under the authority of an act amending 'An act entitled "An act to authorize the establishment of a Bureau of War Risk Insurance in the Treasury Department," approved September 2, 1914, and for other purposes,' approved October 6, 1917, and subject in all respects to the provisions of such act, of any amendments thereto, and of all regulations thereunder, now in force or hereafter adopted, all of which, together with the application for this insurance, and the terms and conditions published under authority of the act, shall constitute the contract."

On July 25, 1919, the Director of the Bureau of War Risk Insurance with the approval of the Secretary of the Treasury promulgated a regulation which contained the following provision:

"1. When any person insured under the provisions of the War Risk Insurance Act leaves the active military or naval service for reasons not precluding the continuation of insurance, the monthly premium which, had he remained in the service, would have been payable on the last day of the calendar month following the date of his discharge, and thereafter monthly premiums shall be payable on the first day of each calendar month. The premium payable on the first day of any calendar month, may, however, be paid at any time during such month, which shall constitute a grace period for the payment of such payment. If the premium is not paid before the expiration of such grace period the insurance shall lapse and terminate."

This regulation makes a distinction between the payment of premiums in the case of those who are in the active military or naval service and those in the inactive service. And again, on September 29, 1919, the distinction again is made in Regulation No. 40 as follows:

"1. While the insured is in the active military or naval service, the monthly premium which is payable on the last day of the calendar month shall be deemed to carry such insurance for the succeeding calendar month irrespective of the effective date of the insurance.

"2. After the insured leaves the active military or naval service, the monthly premium which is payable on the first day of the calendar month shall be deemed to carry such insurance for the current calendar month irrespective of the effective date of the insurance."

In Navy Regulations, in effect October 30, 1917, to October 31, 1918, section 1, under Retainer Pay, the following is found:

"Retainer pay is a bonus allowed all members of the Naval Reserve Force, except members of the Volunteer Naval Reserve, in addition to any pay which may be due them by reason of active duty performed. * * *"

And by section 3, under Allotments, it is provided that members of the Naval Reserve Force on active duty may register allotments of their active duty pay, but that such allotments shall cease upon release from active duty, and then it is declared that "no allotments may be made of the retainer pay."

The first regulation promulgated by the Director of the Bureau of War Risk Insurance, known as Bulletin No. 1, and which was issued on October 15, 1917, contained the following statement:

"Premiums shall be paid monthly on or before the last day of each calendar month, and will, unless the insured otherwise elects in writing, be deducted from any pay due him/her from the United States or deposit by him/her with the United States, and, if so to be deducted, a premium when due will be treated as paid, whether or not such deduction is in fact made, if upon the due date the United States owe him/her on account of pay or deposit an amount sufficient to provide the premium, provided that the premium may be paid within 31 days after the expiration of the month, during which period of grace the insurance shall remain in full force. If any premium be not paid, either in cash or by deduction as herein provided, when due or within the days of grace, this insurance shall immediately terminate, but may be reinstated within six months upon compli-

ance with the terms and conditions specified in the regulations of the Bureau."

This regulation provided that premiums were to be paid monthly on or before the last day of each calendar month and that they would be deducted from "any pay" due. him from the United States "unless the insured otherwise elects in writing." It is not claimed that Emerson ever did "otherwise elect in writing." Moreover, he expressly authorized in writing that the deduction should be made by the United States and at no time revoked the authorization, and the notice that the government would deduct each month from "any" pay is sufficient to comprehend retainer pay as well as active pay.

It also appears that the Bureau of War Risk Insurance adopted and issued a regulation, known as "Form 2303," which was delivered to Emerson on November 6, 1919, which was the date of his release from active duty. It contained, among other statements, the following:

"Information Relative to Compensation and Continuance of War Risk Insurance.
* * *

"Your insurance amounts to $10,000.

"Your monthly premium is $7.80.

"Your account is checked to Nov., 1919.

"After discharge from the service, when your government pay ceases, you should send check or money order, drawn to the Treasurer of the United States, to the Disbursing Clerk, Bureau of War Risk Insurance, Treasury Department, Washington, D. C.

"Do not wait for a notice, but send check or money order promptly on 1st of each month."

Under the contract the premiums were payable at the end of each calendar month, and Emerson had authorized "the necessary monthly deduction from my pay, or, if insufficient, from any deposit with the United States, in payment of the premiums as they become due." He never revoked that authority, and plaintiff claims, therefore, that it continued in full force and in effect down to the date of his death, and that he at all times performed all of the conditions necessary to keep the policy alive.

[1] Emerson's contract of insurance, as stated in the certificate of insurance issued to him and hereinbefore set forth, was by its terms "subject in all respects" to the act of Congress authorizing war risk insurance "and of all *regulations* thereunder now in force or hereafter adopted." The War Risk Insurance Act provided that the Bureau of War Risk Insurance, with the approval of the Secretary of the Treasury, should have power to make "any and all rules and regulations necessary for carrying out the purposes" of the act. A "regulation" of an executive department authorized by an act of Congress gives to the department power to adopt general rules relating to the subject upon which the department acts, made by the head of the department, thereby giving to the regulation adopted the force of law.

[2-4] Authority to make rules and regulations necessary for carrying out the purposes of a legislative act can confer no authority to change the provisions of the act itself, and thereby deprive one of a right given by the act. The Congress cannot delegate legislative power. That it cannot do so is universally recognized as a vital principle of our system of government under the Constitution. Field v. Clark, 143 U. S. 649, 692, 694, 12 S. Ct. 495, 36 L. Ed. 294. But the authority to make administrative rules is not a delegation of legislative power, and to deny the right of Congress to authorize a department of the government to establish administrative rules which shall have the force of law, as Mr. Justice Harlan said in Union Bridge Co. v. United States, 204 U. S. 364, 387, 27 S. Ct. 367, 374 (51 L. Ed. 523), "would be 'to stop the wheels of government.'" See, also, United States v. Grimaud, 220 U. S. 506, 519, 520, 31 S. Ct. 480, 55 L. Ed. 563. It is also undoubted that no "regulation" made by a department of the government under authority so conferred by an act of Congress can alter or amend the law, and that all that can be done is to regulate the mode of carrying into effect that which Congress has enacted. Morrill v. Jones, 106 U. S. 466, 467, 1 S. Ct. 423, 27 L. Ed. 267; United States v. Eaton, 144 U. S. 677, 687, 12 S. Ct. 764, 36 L. Ed. 591; Lynch v. Tilden Co., 265 U. S. 315, 322, 44 S. Ct. 488, 68 L. Ed. 1034.

After Emerson's retirement from the active service, he followed the instructions given in Form 2303 and paid for several months, in due time, the premiums upon his insurance, but he neglected to pay the premium due and payable on May 1, 1920, and the defendant claims that the policy accordingly lapsed at midnight of May 31, 1920. There is no doubt of the lapse of the policy under the Rules and Regulations of the Bureau of War Risk Insurance, provided they are valid. If they were, the contract was, by its terms, subject thereto in all respects, and, not having been complied with, the policy was thereby invalidated.

The meaning of the authorization of the monthly deduction from his "pay" in the contract of war risk insurance was considered in Crawford v. United States (D. C.) 291 F. 801, decided in the District Court for the Eastern District of Ohio. It was held in that case that the deduction of premiums from any pay due the insured, as provided for under the terms of the contract, only authorized deductions from pay accruing from active service, or from deposits deducted monthly in default of adequate allotment from active service pay, and did not authorize deduction from "the retainer pay" of men in the naval reserve. The court held that the policy of an honorably discharged member of the Naval Reserve who had been released from active service, but had not paid the premiums after such release, was terminated, although the government still owed him installments of retainer pay. In the course of his opinion the District Judge said:

"This insurance was available only to men then in active service, and not to members of the United States Naval Reserve on inactive service. The privilege of keeping the insurance in force after discharge from active service and converting it into ordinary life insurance was accorded only to men who had been in the active service. The privilege of taking this insurance was not accorded to men in the United States Naval Reserve, nor as an incident to enrollment in that service. What Congress intended to provide for and insure against were the war risks of active service in the military and naval forces of the United States. Naturally the language used must be construed in view of this general purpose and in connection with the risks and hazards of active military or naval duty."

And he held that "retainer pay is to be regarded, not as pay for services rendered, but as an 'allowance' for readiness to render service if called on, which, by section 22 of the act [Comp. St. 1918, § 514mmm], was expressly excluded from the term 'pay.' "

The Crawford Case was strongly relied upon by the defendant at the argument in this court, and we were informed that it was "on all fours with the present case." The plaintiff took an entirely different view of the case, and counsel informed us that "it is not an authority on any question now before the court, but when properly understood is really in favor of the contention of the plaintiff in error in the case at bar." And in the court below the District Judge, referring to the Crawford Case, said:

"In that case the court was much im-

pressed by the fact that the War Risk Insurance Bureau, as well as the Treasury, War, and Navy Departments, in the practical administration of the law, have not regarded insurance premiums as being deductible from retainer's pay. Such consideration is likewise very persuasive with me, and I am prepared to acquiesce in the construction adopted by the administrative officers."

But the District Judge, while he was prepared to "acquiesce in the construction adopted by the administrative officers" appears also to have been influenced by the fact that Emerson himself had acquiesced in that construction, inasmuch as he actually paid the premiums due in January, February, March, and April, 1920.

[5] We do not agree with the conclusion reached in the Crawford Case that retainer pay was not pay, but an "allowance." A statute which refers to "retainer pay, allowances or gratuities" does not use the words "allowances" or "gratuities" as synonymous with "retainer pay." Retainer pay is the compensation paid to enlisted men retained in the service, but not rendering active service, although liable to be called into active service by the President, and when so called they no longer receive "retainer pay," but "pay." The act of 1916 enacts that "men enrolled in the Fleet Naval Reserve shall be 'paid' at the rate of ⁙ * * per annum, such pay to be considered as 'retainer pay' for the obligation on the part of such members to serve in the Navy in time of war or national emergency." And it also declares that persons commissioned as provided for in the act "shall not be deprived of the retainer pay, allowances or gratuities to which they would be otherwise entitled."

"Allowance" is a term which ordinarily means the same thing as a gift or a gratuity. It is defined in the New Standard Dictionary as "that which is allowed; a portion or amount granted for some purpose, as by custom, military regulation, operation of law; also, a limited amount or portion, as of income or food; as *an allowance of rations.* * * *" And the act of 1918 speaks of "the clothing *gratuity*" credited to the members of the Naval Reserve Force. 40 Stat. part 1, c. 114, p. 711.

At the time this insurance contract was made, war risk insurance was granted by the United States only to persons in the active military or naval service, and premiums could not be deducted under the law and regulations, except from active service pay. And defendant never did deduct, and claims

it never legally could deduct, war risk insurance premiums from any pay other than active service pay, and during the period of active service. In accordance with the agreement, the defendant deducted monthly the insurance premiums from Emerson's active pay as they became due, during the entire period from the time the insurance contract was made to and including the date of his retirement from the active service on November 6, 1919. On that day his active service pay account was paid in full and closed in accordance with the rules and regulations of the Navy Department.

[6] We do not decide this case upon the ground that the War Risk Insurance Bureau, or the Treasury, War, and Navy Departments, in the practical administration of the law, have not regarded insurance premiums as being deductible from retainer's pay. But we must recognize the fact that Congress in the act of 1917, as pointed out at the beginning of this opinion, fully empowered the Director of the Bureau of War Risk Insurance, subject to the general direction of the Secretary of the Treasury, to make rules and regulations necessary or appropriate to carry out its purposes. Under the authority so conferred the Regulation of July 25, 1919, Regulation No. 40, and the Regulation embodied in "Form 2303," were validly adopted and have the force of law.

[7] They seem to us, so far as they affect this case, to be not inconsistent with the provisions of the act of 1917, and to be appropriate to carry out its purposes. They regulate the mode of carrying the act into effect, and we recognize them as having the force of law, and we must also recognize them as a part of the contract upon which this suit is brought. In the written agreement, which Emerson made with the defendant, it was expressly stated that all regulations under the act "now in force or *hereafter adopted* * * * shall constitute the contract." Under those provisions Emerson, after his retirement from active service, could no longer demand that defendant should each month deduct from his pay the monthly premium due from him on his policy. It then became his duty to send his check or money order monthly to the Bureau of War Risk Insurance. And as he failed to do this on May 1, 1920, and continued in default after midnight of May 31, 1920, the policy in our opinion lapsed, and defendant thereafter was released from any obligation on the policy.

Judgment affirmed.

MANTON, Circuit Judge (dissenting). The plaintiff in error, named as beneficiary under an insurance policy issued to August Emerson by the United States of America through the War Risk Insurance Act (40 Stat. part 1, p. 398, c. 105), sues to recover $10,000, the amount of the policy. Emerson was in the service of the United States Coast Guard and was honorably discharged January 9, 1918. On July 22, 1918, he enlisted in the United States Naval Reserve Force for a term of four years (39 Stat. c. 417, p. 587), and continued in this service until October 31, 1919. He was confirmed as a lieutenant in the Naval Reserve Force on October 1, 1919. After his discharge on October 31, 1919, he remained as a member of the Naval Reserve Force and was entitled to retainer pay pursuant to subdivision 4, section 2900½c, Compiled Statutes 1918, p. 377. This retainer pay was the equivalent of two months' base pay of his corresponding rank, grade, and rating in the Navy, and amounted to $41.66 for the quarter ending June 30, 1920. He was drowned July 2, 1920.

This policy of insurance under the War Risk Insurance Act was effective on April 1, 1920. The premium due on that date, amounting to $7.80, was paid; but the premiums for the months of May and June, 1920, in the same amount were not paid by him. The plaintiff in error claims that they were in legal effect paid. The argument is that, since the government owed him pay under the terms of the War Risk Insurance Act, it was the duty of the defendant in error to deduct these premiums from his pay, and thus keep in force and effect his indemnity of insurance. The insurance policy contained the following clause:

"I authorize the necessary monthly deduction from my pay, or, if insufficient, from any deposit with the United States, in payment of the premiums as they become due, unless they be otherwise paid."

On October 15, 1917, the Director of the Bureau of War Risk Insurance promulgated "Bulletin No. 1," which was effective in May and June, 1920, and provides:

"Premiums shall be paid monthly on or before the last day of each calendar month, and will, *unless the insured otherwise elects in writing,* be deducted from any pay due him/her from the United States or deposit by him/her with the United States, and if so to be deducted, a premium when due will be treated as paid, whether or not such deduction is in fact made, if upon the due date the United States owe him/her on account of

pay or deposit an amount sufficient to provide the premium, provided that the premium may be paid within 31 days after the expiration of the month, during which period of grace the insurance shall remain in full force. If any premium be not paid, either in cash or by deduction as herein provided, when due or within the days of grace, this insurance shall immediately terminate, but may be reinstated within six months upon compliance with the terms and conditions specified in the regulations of the Bureau."

At no time did the deceased waive in writing this authorization of the Bureau to deduct premiums from any pay due him. Nowhere does it appear that any substitution for such requirement was made in any regulation promulgated by the Bureau of War Risk Insurance. These instructions agreed to by the insured are binding and controlling upon the Bureau, as well as upon the insured. It may not avoid this, unless it be by Emerson having notified the Bureau that he intended to change or cancel his authorization. Although in the Naval Reserve, he was in the service of the Navy until the day of his death. If the government owed him pay at the time of his death, it was the duty of the government to make the deductions for the premiums and not permit the policy to lapse for nonpayment. Retainer pay is provided for the Naval Reserve Force and is fixed by statute. Subdivision 4, § 2900½c, Comp. St. 1918, p. 377; Subdivision 12, § 2900½a, Comp. Stat. 1918, p. 375. The statute provides a continuance of the Naval Reserve Force, and the retainer pay is always one-sixth of the base pay of the corresponding rank, grade, or rating.

Officers of the Navy who are thus classed are still in the service, and are entitled to the pay which the law allows, not as a gratuity, but as compensation for services. United States v. Tyler, 105 U. S. 244, 26 L. Ed. 985. There is a difference between retirement from active service and retiring wholly and altogether from the service. Officers in this position in the Navy may be called to active service, but when they are recalled, they receive active pay. One on the retainer list of the Naval Reserve Force is required to perform the duties as-prescribed in the statute. Actively employed and inactively employed makes merely the difference in compensation. Kahn v. Anderson, 255 U. S. 1, 41 S. Ct. 224, 65 L. Ed. 469. Therefore Emerson on the retainer list was in the service of the United States and was paid for such service. His pay accrued daily; that

is, from month to month. It was subject to deduction for premiums.

But it is argued that, because the Bureau of War Risk Insurance issued a regulation, "Owner's Form" 2303, which came to Emerson's notice November 6, 1919, the date of his release from active service, and contained the following:

"After discharge from the service, when your government pay ceases, you should send check or money order, drawn to the Treasurer of the United States, to the Disbursing Clerk, Bureau of War Risk Insurance, Treasury Department, Washington, D. C. Do not wait for a notice but send check or money order promptly on 1st of each month,"
—that this changed the effect of the contract that the premiums were payable at the end of each month, and that Emerson had authorized the necessary monthly deduction from his pay, or, if insufficient, from any deposit with the United States for the payment of the premiums as they became due. Of course, a regulation of the executive department authorized by an act of Congress gives the Bureau power to adopt general rules relating to the subject upon which the Bureau acts, and such adoption has the force of law. But such power cannot change the provisions of the act itself and deprive one of the right given pursuant to the act. Such legislative power cannot be delegated to a department.

Form 2303, as effective, says: "After discharge from the service, when your government pay ceases." May 31, 1920, found Emerson still in the service under retainer pay, and there was then due him $27.76; $7.80 per month for two months was due as premiums, and, under the authorization of his application, his pay should have been applied as payment of his premiums. The Bureau did not so apply it, and they may not now take advantage of its refusal so to do. The notice, "when your government pay ceases," does not mean when your government *active* pay ceases. The meaning of the statute is plain that payment may be made from the retainer pay, and as long as the government continued paying, under obligation so to do, as was the case here, there was pay from which the premiums might be deducted under the terms of the policy and under the regulation promulgated by the Bureau. The character of the service and the nature of the pay is fixed, and the government Bureau did not and could not alter it. United States v. Symonds, 120 U. S. 46, 7 S. Ct. 411, 30 L. Ed. 557; United States v. Strong, 125 U. S. 656, 8 S. Ct. 1021, 31 L. Ed. 823. The

fact that Emerson paid on the 1st of each month, for some months previous to his default for the months of May and June, does not change the obligation of one of the contracting parties toward the other. Their rights and obligations were fixed by the contract of insurance, and not by their practice of payment.

For these reasons, I think the judgment below should be reversed, and I dissent from the judgment about to be rendered.