## BROSIUS HOMES CORPORATION *v.* BENNETT ET UX.

[No. 152, October Term, 1952.]

434

*Decided May 20, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Edward D. Storm,* for appellant.

*Robert E. Clapp, Jr.,* with whom were *Stewart Hobbs Brown* and *Edwin F. Nikirk* on the brief, for appellees.

COLLINS, J., delivered the opinion of the Court.

This is an appeal from a decree dismissing the bill of complaint of the appellant, Brosius Homes Corporation, hereinafter referred to as Brosius, for the enforcement of a mechanics' lien.

On February 23, 1951, Brosius and the appellees, R. P. Bennett and Doris E. Bennett, his wife, entered into an agreement by which Brosius, as a builder, agreed to furnish all labor and materials for the construction of a house for the appellees in Frederick County. The Bennetts agreed to pay Brosius therefor the following amounts:

| | |
|---|---:|
| Basic House, Complete, not including lot.... | $7,000.00 |
| Oil tank ........................ | 50.00 |
| Septic tank and field ............ | 345.00 |
| Allowance for well, pump and pit.. | 360.00 |
| | $7,755.00 |
| Less hot water heater by owner | 85.00 |
| | $7,670.00 |

This amount of $7,670.00 was to be paid as follows:

$1,000.00—cash, day construction begins.

3,500.00—on or before the day the house arrives from the manufacturer.

2,000.00—when the foundation for said house is completed.

1,170.00—balance on completion date.

The costs of all additions were to be added to the total amount due.

On November 29, 1951, Brosius filed a bill of complaint alleging the execution of the aforementioned contract; that certain extras in addition to the contract were mutually agreed upon by the parties; that extra labor and materials were provided by the appellant in the amount of $1,742.21. It also alleged that it had fulfilled its part of the agreement and that said dwelling was fully completed on or about September 27, 1951. That its "claim for work done and materials furnished as aforesaid is overdue and although request has been made on the defendants for payment, they have failed to pay the same." There was a further allegation that Brosius had filed in the office of the Clerk of the Circuit Court for Frederick County on October 24, 1951, its claim as

a lien against the dwelling house and parcel of ground upon which the house was erected. This claim contains a description of the kind and amount of materials furnished and work done by appellant on the erection and construction of the dwelling and the price agreed upon. The amount claimed to be due on account of said dwelling was the final payment of $1,170.00 and the extras in the amount of $1,742.21, the total due being $2,912.21. Appellant asked that a decree be passed for the sale of the property or so much thereof as may be necessary for the purpose of collecting its claim with interest. Filed with the bill of complaint was the mechanics' lien aforesaid.

An answer and cross bill of complaint was filed by the Bennetts in which they admitted the execution of the aforementioned contract. They admitted that certain extras were agreed upon, but denied that these extras were in the amount claimed by the appellant. They denied that the appellant had fulfilled its part of the contract. They further denied that the appellant had perfected the mechanics' lien as alleged, due to its failure to substantially comply with the requirements of the law pertaining to such liens. They also alleged that, due to the aid and technical assistance rendered by Robert Bennett to the appellant, he was entitled to recoup. The appellees further alleged that due to the neglect and omissions of the appellant they had been put to additional expense in renting and maintaining another home. They prayed that the appellant be required to pay to the appellees the sum of $5,000.00 for damages. An answer was filed by the appellant to the cross bill denying the material allegations thereof. After taking of extensive testimony the chancellor filed a decree on November 28, 1952, dismissing appellant's bill of complaint, without prejudice, solely on the ground that the mechanics' lien and the bill of complaint to enforce that lien had been filed before the approval of the work by the Federal Housing Administration (the FHA) and that therefore the mechanics' lien was defective and

could not be enforced by such a bill. From that decree the appellant appeals. From the record before us no action was taken on the cross bill.

The primary question before us in this case is whether the final payment was conditioned upon formal approval by the FHA. The only reference in the contract to any such approval is the following clause: "The owner agrees not to move any household goods or other material into the house until it has been completed and final approval has been received from Federal Housing Administration and/or Veterans Administration, and until the house has been accepted by the Owner and the total purchase price has been paid in full." There is no mention in the contract about the well or of the amount of water to be furnished other than as aforesaid: "Allowance for well, pump, and pit—$360.00."

It developed in the testimony before the chancellor that during the course of construction the FHA made five inspection reports. Apparently, the first three reports were satisfactory because the appellees paid the first three installments under the contract. The fourth report on September 17, 1951, was as follows: "Well not satisfactory to FHA. Flow as stated on form 2217 is only ½ gallon per minute. FHA minimum flow for wells is 5 gallons per minute."

Testimony was taken in this case on two occasions. During the taking of the testimony at the second hearing a letter, the fifth report, dated June 30, 1952, from the director of the FHA to the Farmers and Mechanics National Bank of Frederick was offered in evidence in which the FHA notified the bank that it was willing to withdraw its former report, relative to well capacity, and that it would insure the loan. At that second hearing, Mr. J. Hamilton Walker, Chief Construction Examiner and Chief of Architectural Section, FHA, testified that on the basis of tests made and submitted by Mr. J. William Brosius, the president of appellant corporation, since the pump installation, his agency was then willing to insure the loan. There was considerable testimony

that prior to the date of the filing of the mechanics' lien there was sufficient water provided for ordinary household needs. Although in one part of the testimony, Mr. William Brosius testified on cross examination in answer to a question, that he understood approval by the FHA was necessary before final payment, he later corrected this by saying: "Previously when Mr. Nikirk asked me the question—just read it out to me—I didn't have a chance to think it over or read it—but the contract specifically says that the owner shall not move these things until the house has been completed and final approval has been received from VA or FHA. However, the final approval by VA or FHA refers back to the owner moving in and paying the price in full and does not refer to payment on approval of FHA or VA, doesn't preclude paying the balance of the contract due on the completion date. The contract calls for $1170 balance on completion date. It doesn't say balance after approval by FHA." We are of opinion that as there was no provision in the contract that final payment depended upon approval by the FHA, such approval was not necessary before final payment was due. Assuming, however, that such approval was necessary, it was shown that no tests had been made by the FHA of the water supply and that nothing had been done on the well between the time of its completion, and disapproval by the FHA on September 17, 1951, and the approval on June 30, 1952. Therefore there was no adequate reason why disapproval was given on September 17, 1951. We are therefore of opinion that the balance of $1,170.00 was due and payable at the time of the filing of the mechanics' lien on October 24, 1951, and that the mechanics' lien and bill of complaint had not been prematurely filed. *Treusch v. Shryock,* 51 Md. 162, 169; *McLaughlin v. Reinhart,* 54 Md. 71; Code (1951), Article 63, Sections 2 and 3.

Included in the mechanics' lien were the following amounts charged as extras, not covered by the contract:

Grading .......................... 93.91
15% supervision, overhead, profit.... 14.09

$108.00

Shower in Bathroom ............... 18.00
15% supervision, overhead, profit .... 2.70

20.70

Attic fan ....................... 22.92
15% overhead, supervision, profit .... 3.44

26.36

Porch ........................... 90.34
15% overhead, supervision, profit .... 13.54

103.88

C grade Tile ..................... 11.89
15% overhead, supervision, profit .... 1.79

13.68

Seeding Lawn ....................197.00
Less Amount allowed .............. 65.00

Difference at cost ................132.00
15% for supervision, overhead, profit
   on $132.00 ..................... 19.80

151.80

Total cost, less drilling of well ......641.56
15% overhead, supervision, profit on
   above .......................... 96.23
Drilling of well, Keyser @ 4.00/ft.:...940.00

1677.79
Less contract allowance ............360.00

Balance due .....................1317.79

Total due for Extras .............. $1,742.21

The appellees claim the appellant did not prove these amounts claimed for extras and that where no definite wage is agreed upon in a building contract, the wage is the reasonable value of the work done. *House v. Fissell*, 188 Md. 160, 51 A. 2d 669. Mr. Brosius testified as to each of these items, showing he charged the appellees the actual cost to him of the materials and labor. These cost prices, actually paid by the appellant, do not appear to be unreasonable and the appellees have not shown that the work could have been done for a less amount. Mr. Brosius further testified that the amount charged for the well drilling was the ordinary and usual fair price. As to the charge of 15% for supervision, overhead and profit, Mr. Brosius testified: "You contact your customer for extra work such as has to be done by the owner during the course of construction." He further said "the extras as billed to Mr. Bennett" were requested by him, were agreed to by him, and were completed at his direction in the normal course of business. There was no testimony contesting the reasonableness of these extra charges. Compare *District Heights Apartments et al. v. Noland Co.*, 202 Md. 43, 95 A. 2d 90.

The appellees further claim that under the contract the total cost of providing a well other than the amount of $360.00 "allowed" was to be paid by the appellant. Mr. Brosius, on the other hand, claimed that under the contract the allowance or estimate of $360.00 was made for the drilling of the well and that any further amount expended was to be paid by the appellees. With this contention of the appellant we agree. Mr. Brosius testified that there was no quantitative or qualitative guarantee given on the well of any kind because of the extreme uncertainty of well drilling. He further testified that after the contract was signed: "Mr. Bennett stated at that time that he had not understood this was to be paid for, and I insisted I was sure I had talked to him about it; and we came to an agreement at that time that Mr. Bennett would undertake to pay the extra over and above the allowance figure should it exceed

the allowance." Mr. Bennett, on the other hand, denied that he made any agreement to the effect that, if the well cost more than $360.00, he would pay that cost. He said he never agreed to pay any additional amount for the well. Later, however, when asked: "Did you ever agree with either Mr. Bill Brosius or Louie Brosius that you would pay any additional amounts for this well?" he answered: "No, except and until water was provided that was adequate." As hereinbefore set out, there was much testimony that before the filing of the lien, the water supply was adequate for ordinary household needs. Mr. Charles F. Bowers, an architect whose qualifications were admitted by the appellees, when asked about the provision of the contract reading "allowance for well, pump and pit, $360.00," testified that usually when an agreement is made about allowances, it is generally agreed that if the article actually costs more, the owner will pay the difference. Such a clause did not appear in the contract here. He said: "In a proposition like this, there was an uncertainty as to the well, I would say. Any well digging is an uncertainty. You can't tell what it is going to be." He also said that the term was frequently used in contracts in Frederick County. He further said: "Well, in any contract we write an allowance for hardware, medicine cabinet or cabinets in the kitchen, such like, and it is either understood or we generally understand that the owner will pay the difference in cost provided the cost is more than allowed, or if it becomes less than the cost allowed, he gets the difference. That is the general practice in most cases, in which it is mentioned in the contract." It is hardly reasonable to suppose that a contractor would set a definite amount for driving a well, as it is seldom known to what depth such a well must be driven before a sufficient amount of water is obtained. In Black's Law Dictionary "allowance" is defined as "a deduction, an average payment, a portion assigned or allowed; the act of allowing. See *Stone v. State,* 197 Ala. 293, 72 So. 536, 537; *Sawyer v. U. S.* (C. C. A.) 10 F. 2d 416, 421."

442

Page 247, Volume 3, *Words* and *Phrases,* contains the following: "an 'allowance' is that which is allowed; a share or portion allotted or granted; an appropriation for any purpose; a stated quantity, as of food or drink. (Webster). *De Roche v. De Roche,* N. D., 94 N. W. 767, 770." An allowance is often used in the same way as fees, commissions and percentages which are uncertain and variable in amount. *Brandon v. Askew,* 172 Ala. 160, 54 So. 605, 608. The fact that the cost of the well was uncertain and indefinite in amount is evident because the cost of other articles such as the oil tank and the septic tank are stated in definite amounts.

We are therefore of opinion that the appellant is due the amount of $1,170.00 payable upon completion of the contract, and the $1,742.21 for extras, making a total of $2,912.21 with interest from October 24, 1951, when the mechanics' lien was filed. The case will therefore be remanded in order that a decree may be passed, as prayed by the appellant, for the sale of the property or so much thereof as may be necessary for the purpose of collecting this amount.

> *Decree reversed, with costs, and cause remanded for the passage of a decree to conform with this opinion.*