STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
DAVID A. ROSENFELD, DEFENDANT-RESPONDENT.

Argued February 6, 1973—Decided May 7, 1973.

Mr. *Wilbur H. Mathesius,* First Assistant Prosecutor, argued the cause for the appellant (*Mr. Bruce M. Schragger,* Mercer County Prosecutor, attorney).

Mr. *Richard J. Schachter* argued the cause for the respondent (*Messrs. Halpern, Schachter & Wohl,* attorneys).

Mr. *John J. DeCicco,* Deputy Attorney General, argued the cause for Mr. George F. Kugler, Jr., Attorney General of New Jersey, *amicus curiae.*

The opinion of the Court was delivered by

JACOBS, J.    The defendant was charged with violating *N. J. S. A.* 2A:170–29(1) by using foul language at a public meeting. There was a judgment of conviction and the defendant was fined $50, plus $10 costs, but on his ultimate appeal the United States Supreme Court, without opinion, vacated the judgment and remanded the case to the Appellate Division "for reconsideration" in the light of *Cohen v. California,* 403 *U. S.* 15, 91 S. Ct. 1780, 29 *L. Ed.* 2d 284

(1971) and *Gooding v. Wilson,* 405 *U. S.* 518, 92 S. Ct. 1103, 31 *L. Ed. 2d* 408 (1972). There were four dissents with opinions. 408 *U. S.* 901, 92 S. Ct. 2479, 33 *L. Ed. 2d* 321 (1972). Thereafter the Appellate Division held that under *Gooding, N. J. S. A.* 2A:170-29(1) was "overly broad and violative of the First Amendment" and set aside the defendant's conviction. 120 *N. J. Super.* 458 (1972). The Mercer County Prosecutor duly appealed on the State's behalf and, with leave, the Attorney General appeared *amicus curiae.*

There had been racial conflicts in the Borough of Hightstown and a meeting to discuss the subject was being held in a school auditorium. It was well attended by both Blacks and Whites and included men and women, along with children ranging between thirteen and eighteen years of age. The defendant, a young schoolteacher, attended the meeting with plans to talk on the racism which he had found in the local school system. When his turn came he did talk and he presented an analysis of what had been happening and urged that corrective steps be taken expeditiously. He was emotionally involved and concluded his talk with the remark that if we Whites didn't do something about the problem "then the Mother F——ing town, the M.F. county, the M.F. state and the M.F. country would burn down.

When the defendant finished there was some cheering and applause, particularly from the young Blacks in the audience. But Chief Michinsky of the East Windsor Township Police rose from his seat and pointed to Chief Archer of the Hightstown Police indicating that he wanted the defendant arrested. No one else rose and the meeting proceeded in regular fashion and without disturbance. After the meeting was over Chief Archer went to his headquarters and typed a complaint and thereafter the defendant was arrested at his home. The complaint charged without more that the defendant used "loud and indecent language" at a public meeting, by using the words M.F. four times "in front of the public and the complaint," in violation of *N. J. S. A.* 2A:170-29(1). *State v.*

*Profaci,* 56 *N. J.* 346 (1970), held that for a defendant to be guilty under *N. J. S. A.* 2A:170–29(1) the indecent words "must be spoken loudly, in a public place and must be of such a nature as [1] to be likely to incite the hearer to an immediate breach of the peace or [2] to be likely, in the light of the gender and age of the listener and the setting of the utterance, to affect the sensibilities of a hearer"; and under either alternative the words "must be spoken with the intent to have the above effect or with a reckless disregard of the probability of the above consequences." 56 *N. J.* at 353; *State v. Reed,* 56 *N. J.* 354, 357 (1970); *cf. State v. Palendrano,* 120 *N. J. Super.* 336, 343 (*Law Div.* 1972); *Karp v. Collins,* 310 *F. Supp.* 627, 635–638 (*D. N. J.* 1970), *vacated sub nom. Kugler v. Karp,* 401 *U. S.* 930, 91 S. Ct. 933, 28 *L. Ed. 2d* 210 (1971), *modified,* 333 *F. Supp.* 15 (*D. N. J.* 1971).

The defendant, after being found guilty in the Hightstown Municipal Court, appealed to the Mercer County Court where a trial *de novo* was held. Chiefs Archer and Michinsky testified for the State, along with Mr. Wright who also attended the meeting. Chief Archer heard the objectionable words but testified that he did not really understand their context; he observed no indications of any impending disturbances. Chief Michinsky testified that he was "very shocked" and that his intention at the time he arose was to have the defendant "arrested right on the scene, and taken out of there." Mr. Wright testified that he was offended by the use of the words and that he felt it "sad that a man who is obviously a college graduate should have to resort to this type of language to make a point."

Several witnesses testified on behalf of the defendant to the effect that their sensibilities were not affected. Thus Mr. Seitz, a member of the Board of Education of a sending district to Hightstown, testified that he "understood this to be a word which generally is used by Blacks more often than by Whites, which expresses a sense of outrage, in a general sense. I don't think the word was used in a specific sense in

this context." Mr. Seitz viewed the word as enhancing the meaning of the defendant's remarks; he "felt that it drew attention to the sense of outrage at the fact that grievances, and real grievances, had been ignored, grievances on the part of the black community." Similarly, Mr. Benedict, an officer of the New Jersey Bankers Association, testified that his sensibilities were not affected, that the language indicated that the defendant "felt very, very strongly about what he was saying," and that in context it had no sexual signification. Along the same lines, Dr. Knapp of Princeton University, testified that the words enhanced the meaning of the defendant's remarks and that in their institutional context they carried no sexual import.

The defendant testified that he was twenty-five years of age, was graduated from Brown University, had done graduate work elsewhere, and planned to attend law school. He recognized that some in the audience might be offended but envisioned no danger of any breach of the peace. His intent in using the word was described by him in the following terms: "I obviously wanted to make it clear how I felt. I felt the use of the strong language would be necessary. * * * The word as I have used it never had a sexual connotation. In fact, afterwards I realized what the sexual connotation was. I tried to use the word because it's a word that comes out of the black ghetto; and the apposition of a black word to what are essentially white institutions, the town and county, seemed to me to say and characterize those problems which existed in Hightstown and the rest of the country. It seemed like a word whose color and use in that sense was very effective." See Landy, *The Underground Dictionary*, p. 135 (1971) ; Wilson, *Playboy's Book of Forbidden Words*, p. 197 (1972) ; *cf.* Lifton, "The Young and The Old," *The Atlantic* (September 1969), *pp.* 48, 50–52; see also *Papish v. The Board of Curators of the University of Missouri*, 464 *F. 2d* 136, 146 (8 *Cir.* 1972) (dissenting opinion) ; *Duke v. North Texas State University*, 338 *F. Supp.* 990, 997 (*D. Texas* 1971).

At the close of the testimony, the Mercer County Court did not find that the words in their context were "likely to incite the hearer to an immediate breach of the peace" within the first alternative set forth in *Profaci* (56 *N. J.* at 353). Nor would the testimony have supported such finding. The words were not addressed face to face to any individual nor did they refer to any individual. They referred to the town, the county, the state and the country and in their institutional context they carried no sexual connotation. They were in bad taste, were undoubtedly offensive to many in the audience, and were probably self-defeating. But under the circumstances and in context they were not likely to and did not incite any breach of the peace. They were not rendered as "fighting words" within the original contemplation of *Chaplinsky v. New Hampshire,* 315 *U. S.* 568, 62 S. Ct. 766, 86 *L. Ed.* 1031 (1942), and surely not within the Supreme Court's later narrowing formulations and applications of *Chaplinsky.* See *Street v. New York,* 394 *U. S.* 576, 592, 89 S. Ct. 1354, 1365, 22 *L. Ed. 2d* 572, 585 (1969); *Bachellar v. Maryland,* 397 *U. S.* 564, 567, 90 S. Ct. 1312, 1314, 25 *L. Ed. 2d* 570, 573–574 (1970); *Cohen v. California, supra,* 403 *U. S.* at 20, 91 S. Ct. at 1785, 29 *L. Ed. 2d* at 291; *Gooding v. Wilson, supra,* 405 *U. S.* at 524, 92 S. Ct. at 1106, 31 *L. Ed. 2d* at 415.

The Mercer County Court, invoking the second alternative in *Profaci* (56 *N. J.* at 353), found that the language was of such nature "that it would likely, in the light of the gender and the age of the people present, the women that were present, affect the sensibilities of the hearers." The County Court went on to say that the matter was "accentuated by the setting of the utterance" and that the language "clearly breaches the limits of decent speech" and is not protected by the First Amendment. The Appellate Division affirmed the County Court's finding and certification was denied. 59 *N. J.* 435 (1971). Thereafter, as set forth earlier in this opinion, the Supreme Court remanded the case to the Appellate Division which filed an opinion setting aside the defend-

ant's conviction. 120 *N. J. Super.* 458. The Appellate Division expressly found that the second alternative in *Profaci* sweeps "too broadly" and renders *N. J. S. A.* 2A:170–29(1) unconstitutionally overbroad within *Gooding v. Wilson, supra,* 405 *U. S.* 518, 92 S. Ct. 1103, 31 *L. Ed. 2d* 408. See also *Cohen v. California, supra,* 403 *U. S.* 15, 91 S. Ct. 1780, 29 *L. Ed. 2d* 284.

In *Cohen* the defendant wore a jacket bearing the words "F — — — the draft" in a corridor of the Los Angeles County Courthouse. He was convicted under a state statute which prohibited the disturbance of the peace by offensive conduct or indecent language. In reversing his conviction, a majority of the Supreme Court noted that while a state was free to ban "fighting words" under *Chaplinsky* (315 *U. S.* 568, 62 S. Ct. 766, 86 *L. Ed.* 1031), here the objectionable words were not "directed to the person of the hearer" and no one present could reasonably have regarded the words on the jacket "as a direct personal insult." 403 *U. S.* at 20, 91 S. Ct. at 1785, 29 *L. Ed. 2d* at 291. It noted further that the state could not constitutionally, under a blanket prohibition as here, excise an offensive word from the public vocabulary or discourse in order "to protect the sensitive." 403 *U. S.* at 21–25, 91 S. Ct. at 1786–1788, 29 *L. Ed. 2d* at 291–295. In *Gooding* the defendant was charged with violating a Georgia statute which provided that any person who used "opprobrious words or abusive language, tending to cause a breach of the peace" would be guilty of a misdemeanor. He was convicted in the Georgia courts but his conviction was upset by the Supreme Court in an opinion which found that the statute, as applied by the Georgia courts, was unconstitutionally overbroad. 405 *U. S.* at 527, 92 S. Ct. at 1108, 31 *L. Ed. 2d* at 417. Speaking for the majority, Justice Brennan stressed that the Georgia courts had interpreted the statutory language to make it a breach of the peace "merely to speak words offensive to some who hear them," and so sweeps too broadly. 405 *U. S.* at 527, 92 S. Ct. at 1108, 31 *L. Ed. 2d* at 417.

Both the Attorney General and the Mercer County Prosecutor agree that under the cited Supreme Court decisions the second alternative in *Profaci* (56 *N. J.* at 353) is no longer viable. Thus the Attorney General's brief acknowledges that *N. J. S. A.* 2A:170–29(1) "may not be utilized to punish speech which solely is offensive to the sensibilities of the hearer"; and similarly the Prosecutor's brief acknowledges that the views expressed by the majority in *Gooding* dictate the conclusion that so much in *Profaci* as denies First Amendment protection to language which "affects one's sensibilities" is no longer valid. The Prosecutor nonetheless opposes the setting aside of the defendant's conviction and requests that the defendant's language now be held by us to constitute "fighting words" under *Chaplinsky* or that the matter be remanded for further factual development. We find no occasion for such remand since the factual matters were fully explored during the hearing before the Mercer County Court and the taking of further testimony at this late date would tend towards oppression and would in all likelihood be unproductive. We have already indicated that we are satisfied from the record before us that under the circumstances and in context the objectionable words were not likely to and did not incite any breach of the peace within the contemplation of the first alternative in *Profaci*.

The Attorney General urges that despite *Cohen* and *Gooding, N. J. S. A.* 2A:107–29(1) may remain in effect to the extent that it proscribes offensive language which is spoken loudly in a public place and is likely to incite the hearer to an immediate breach of the peace, as set forth in *Profaci's* first alternative. We agree and find that the Appellate Division went too far in striking *N. J. S. A.* 2A:170–29(1) in its entirety. The majority opinions in both *Cohen* and *Gooding* clearly recognize that the states may still proscribe the use in public places of words likely to cause breaches of the peace and we are satisfied that *Profaci's* first alternative does no more, is adequately informative to the populace, and is narrowly limited in sufficient compliance

with First Amendment concepts as currently expressed in *Cohen* and *Gooding*. See *City of St. Petersburg v. Waller,* 261 *So. 2d* 151, 158–159 (*Fla. Sup. Ct.* 1972), *cert. denied,* 409 *U. S.* 989, 93 S. Ct. 312, 34 *L. Ed. 2d* 256 (1972); *cf. Meyers v. State,* —— *Ark.* ——, 484 *S. W. 2d* 334, 337 (1972); see also Notes, 21 *De Paul L. Rev.* 546 (1971); 50 *N. C. L. Rev.* 382 (1972).

The Attorney General further urges that *Profaci's* second alternative should not be entirely abandoned but should now be restructured to prohibit language "which would be so grossly offensive to members of the public so as to amount to a nuisance." Any formulation in those terms would present factual uncertainties and obscurities of meaning and would not be at all likely to satisfy *Cohen* and *Gooding*. See Wright, J., dissenting in *Von Sleitcher v. United States,* 472 *F. 2d* 1244 (*D. C. Cir.*), *cert. denied,* 409 *U. S.* 1063, 93 S. Ct. 555, 34 *L. Ed. 2d* 517 (1972). In any event, the restructuring of *Profaci's* second alternative at this time would implicate currently troublesome policy considerations which should in the first instance be dealt with by our Legislature rather than this Court. Many of these considerations are suggested in Justice Harlan's opinion for the majority in *Cohen* and determinations as to the lines to be drawn are at this juncture more appropriately to be made by the legislative rather than the judicial branch.

Thus in *Cohen* the state contended that the conviction might stand since the defendant wore the objectionable jacket in a courthouse where there is a special interest in preserving "an appropriately decorous atmosphere" (403 *U. S.* at 19, 91 S. Ct. at 1785, 29 *L. Ed 2d* at 290) but the Court rejected the contention, pointing out that the statute did not distinguish between locations and applied throughout the state. A further contention by the state that it could legitimately protect "unwilling or unsuspecting viewers" from Cohen's crude form of protest was similarly rejected with the thought that the public's right of privacy did not extend to the circumstances at hand, particularly since the members

of the public "could effectively avoid further bombardment of their sensibilities simply by averting their eyes." 403 *U. S.* at 21, 91 S. Ct. at 1786, 29 *L. Ed. 2d* at 292. Elsewhere in its opinion the Court differentiated the case before it from one where, after police warning, the defendant persisted with the goal of provoking hostile group reaction. 403 *U. S.* at 20, 91 S. Ct. at 1785, 29 *L. Ed. 2d* at 291; see *Feiner v. New York,* 340 *U. S.* 315, 71 S. Ct. 303, 95 *L. Ed.* 295 (1951); *Terminiello v. Chicago,* 337 *U. S.* 1, 69 S. Ct. 894, 93 *L. Ed.* 1131 (1949); *cf. Camarco v. City of Orange,* 61 *N. J.* 463 (1972).

No purpose would be served by our pursuing the choices available to the Legislature for the policy judgments must rest entirely with it and whatever course it ultimately takes must be in the full light of *Cohen, Gooding* and pertinent Supreme Court developments. Since constitutional freedoms are involved, sensitive tools must be used (*Gooding,* 405 *U. S.* at 527, 92 S. Ct. at 1108, 31 *L. Ed. 2d* at 417) and careful balances must be struck (*Cohen,* 403 *U. S.* at 19, 91 S. Ct. at 1785, 29 *L. Ed. 2d* at 290). Justice Harlan's opinion for the Court in *Cohen* specifically pointed out that "the State has no right to cleanse public debate to the point where it is grammatically palatable to the most squeamish among us." 403 *U. S.* at 25, 91 S. Ct. at 1788, 29 *L. Ed. 2d* at 294. And the Court's judgment in Cohen specifically held that, absent a particularized and compelling reason, the state could not consistently with the First and Fourteenth Amendments make the simple public display "of this single four-letter expletive," a criminal offense. 403 *U. S.* at 26, 91 S. Ct. at 1788, 29 *L. Ed. 2d* at 294–295. For reasons we have earlier expressed, the defendant's conviction may not stand although the underlying statute (*N. J. S. A.* 2A:170–29(1)) may stand to the extent that it prohibits indecent language which is spoken loudly in a public place and is of such nature as to be likely to incite the hearer to an immediate breach of the peace. While this simply restates and continues

the first alternative in *Profaci,* the second alternative may now be considered exscinded. See 56 *N. J.* at 353.

The judgment of the Appellate Division is modified in accordance with this opinion and as thus modified it is hereby:

Affirmed.

*For affirmance and modification*—Chief Justice WEIN-TRAUB, Justices JACOBS, HALL and MOUNTAIN and Judges CONFORD and LEWIS—6.

*For reversal*—None.