2003 VT 14

## Carol Ann Martin v. State of Vermont, Agency of Transportation Department of Motor Vehicles

[819 A.2d 742]

No. 01-214

Present: **Amestoy, C.J., Dooley, Morse, Johnson and Skoglund, JJ.**

Opinion Filed February 7, 2003

---

*John H. Bloomer, Jr.* of *McClallen & Bloomer, P.C.*, Rutland, for Plaintiff-Appellant.

*William H. Sorrell*, Attorney General, *William E. Griffin*, Chief Assistant Attorney General, and *Bridget C. Asay*, Assistant Attorney General, Montpelier, for Defendant-Appellee.

¶ 1.  **Amestoy, C.J.** Plaintiff Carol Ann Martin appeals the superior court's decision upholding the Department of Motor Vehicles' (DMV) refusal to issue her a special motor vehicle license plate displaying the letters "IRISH." We conclude that the administrative regulation upon which DMV based its ruling is inconsistent with, and thus unauthorized by, the governing statute. Accordingly, we reverse the superior court's decision.

¶ 2.  This case is an example of what can happen when law and common sense depart. The governing statute provides that the Commissioner of DMV "may refuse to honor any [vanity plate] request that might be offensive or confusing to the general public." 23 V.S.A. § 304(d). Neither DMV in refusing to grant the "IRISH" plate, nor the State in its argument before this Court, have asserted that "IRISH" is a word that might be offensive to the public — undoubtedly because the general public would find the assertion more offensive than the word.[1] Rather, DMV's decision, the superior court's opinion upholding that decision, and the

---

[1] Moreover, any contention that DMV has either the expertise or information to gauge the sensitivity of the general public to the offense generated by "IRISH" would leave unexplained why, in the previous fifteen years, DMV had approved Martin's requests for an "IRISH" truck plate, an "IRISH1" conservation plate, and "IRISH1" and "IRISH2" car plates.

State's defense of both rely upon an administrative regulation that seeks to insulate the vanity plate program from constitutional attack by removing the Commissioner's statutory obligation to determine a requested plate's potential to offend the general public.[2] That the Legislature could relieve the Commissioner of such an obligation we have no doubt. But until that body has chosen to do so by amending the statute currently granting the Commissioner the authority to refuse only those requests that "might be offensive or confusing to the general public," we cannot find a legal basis to uphold a regulation that assumes powers greater than those set forth in the statute purportedly authorizing the regulation.

¶ 3. The instant case arose when Martin submitted a special plate application to DMV listing two choices, "IRISH" and "IRISH1." Martin received a letter from DMV stating that her application could not be processed because the Commissioner may deny any special plate request that might be offensive or confusing to the general public.[3] Martin requested an administrative hearing, which was held before a DMV hearing officer. At the hearing, DMV did not offer any specific evidence indicating that the requested plate might be offensive to the general pubic, but rather relied exclusively upon the new regulation's categorical exclusion of references to ethnic heritage. In her written decision upholding the denial of Martin's request, the hearing officer concluded that the Commissioner has the authority to deny a request for special plates referring to ethnic heritage, irrespective of whether the reference is a positive or negative connotation.

¶ 4. Martin appealed that ruling to the superior court pursuant to V.R.C.P. 74 (appeals from decisions of governmental agencies). The court held a hearing at which both Martin and the State presented oral argument. In its written decision following the hearing, the court rejected Martin's request for declaratory relief based on the following rationale:

---

[2] In relevant part, the June 2000 amended regulation provides that requests for combinations of letters and numbers "that might be offensive or confusing to the general public" will not be issued. DMV Rule 16I.(f) (Registration Plates), 8A Code of Vt. Rules 14 050 025-2 to 14 050 025-3 (2000). The regulation sets forth seven categories making up a nonexhaustive list of combinations that will not be issued, including "(4) Combination of letters, or numbers that refer, in any language, to a race, religion, color, deity, ethnic heritage, gender, sexual orientation, disability status, or political affiliation." DMV Rule 16I.(f) (Registration Plates), 8A Code of Vt. Rules 14 050 025-3 (2002).

[3] A plate would be "confusing" if its combination of letters and numbers made it difficult to read or to identify in relation to other similar plates. No one is suggesting that "IRISH" is confusing.

Given the statutory authority to ban the offensive, and the constitutional mandate to avoid viewpoint discrimination, the Commissioner's regulation to place ethnic references off the table for license plates is reasonable, statutorily authorized and constitutionally necessary if the state is to preserve its vanity license plate program and also avoid the issuance of patently offensive license plates.

¶ 5. On appeal to this Court, Martin argues that the amended regulation is invalid because it is contrary to the intent of the Legislature, overbroad, and arbitrary. Martin also argues that both the regulation and its governing statute, 23 V.S.A. § 304(d), violate the First Amendment of the United States Constitution because they give DMV unfettered discretion to discriminate based on the viewpoint of the applicant. The State responds that the regulation is consistent with § 304(d), and is necessary both to insulate the statute from constitutional challenges and to alleviate DMV's administrative burden. The State also contends that Martin's constitutional arguments were waived and, in any event, are without merit.

I.

¶ 6.  This case is unusual in that it is the *anticipation* of a constitutional challenge that formed the basis of not only the superior court's decision and the State's defense of the case, but also of the challenged regulation itself. Through regulation, the State sought to resolve a legal dilemma — how does one constitutionally implement a statute when the Commissioner's discretion to issue vanity plates must be grounded in a determination of what might offend the public, given the susceptibility of such a statute to constitutional attack for allowing viewpoint discrimination in a designated or nonpublic forum? It is the attempt of the State's lawyers to address this legal dilemma that frames this case.

¶ 7.  To be sure, the State's sensitivity to the potential constitutional complications of a vanity plate program is well founded. While a special plate program limiting requests to names and places would negate all but the most frivolous challenges, the decision of state legislatures to authorize more expansive (and lucrative) vanity plate programs has implicated more significant First Amendment concerns. Although courts and commentators have differed on the extent to which the establishment of a vanity plate regime implicates free speech rights, there is little doubt that there are some constitutional limitations on the government's

authority in this area.[4] See generally M. Herald, *Licensed to Speak: The Case of Vanity Plates*, 72 U. Colo. L. Rev. 595 (2001); L. Jacobs, *The Public Sensibilities Forum*, 95 Nw. U. L. Rev. 1357 (2001).

¶ 8. But though the State's preemptive strike is understandable, neither its lawyers nor this Court is free to ignore the plain meaning of a legislative enactment in contemplation of its perceived legal infirmities. Indeed, the State has cited no case law, and we have found none, suggesting that an administrative agency can promulgate regulations inconsistent with an unambiguous statute to save the statute from a potential constitutional attack. Rather, the State cites *In re G.T.*, 170 Vt. 507, 517, 758 A.2d 301, 308 (2000), for the unremarkable proposition that in "exceptional circumstances" *this Court* "must narrow the reach of a broadly-worded statute to make it consistent with other statutes or to avoid serious questions of constitutionality." Of course, "[u]nlike courts, which are granted their power by the Constitution, see Vt. Const. ch. II, § 4, administrative bodies have only the adjudicatory authority conferred on them by statute." *Workers' Comp. Div. v. Hodgdon*, 171 Vt. 526, 529, 759 A.2d 73, 77 (2000) (mem.).

¶ 9. Even assuming that DMV stood on par with this Court in terms of insulating § 304(d) from constitutional attack, see *Elks Lodges 719 & 2021 v. Dep't of Alcoholic Beverage Control*, 905 P.2d 1189, 1202 (Utah 1995) (as with court, agency must prefer constitutional reading of statute over unconstitutional interpretation), the agency's attempt to protect the statute is misplaced because, as discussed in more detail below, § 304(d) is not ambiguous.[5] If a statute is unambiguous, an agency cannot insulate it from constitutional attack by adopting a new interpretation unsupported by the statutory language. See *Nat'l Rifle*

---

[4] The United States Supreme Court has employed a "forum" analysis in determining the level of protection provided by the First Amendment when the government seeks to restrict speech in connection with the use of its property. See *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985); *Perry v. McDonald*, 280 F.3d 159, 166 (2d Cir. 2001). Government regulation of speech in traditional public fora (property such as public streets and parks that has been devoted by long tradition to assembly and debate) and designated public fora (property in which the government has purposefully opened a nontraditional forum for public debate) is subject to strict scrutiny under the First Amendment. *Perry*, 280 F.3d at 166. Other government properties are considered nonpublic fora in which the government may impose restrictions on speech as long as the restrictions are reasonable and viewpoint-neutral. *Id.*

[5] While the word "offensive" may be susceptible to different meanings, as the dissent points out — for example, it may mean aggressive or repugnant, or it may even designate on what side of the ball a football player is lined up — neither the word "offensive" nor the word "confusing" in the context of § 304(d) makes that statute ambiguous.

*Ass'n of Am. v. Reno*, 216 F.3d 122, 127 (D.C. Cir. 2000) (quoting *Chevron U. S. A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984), for proposition that " 'the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress' "); see also *United States v. Robel*, 389 U.S. 258, 267 (1967) (task of writing legislation within constitutional bounds is "committed to Congress"); *Scales v. United States*, 367 U.S. 203, 211 (1961) ("Although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute.").

¶ 10. The obligation to refrain from rewriting a statute to insulate it from constitutional attack is particularly strong, even for courts, when the revised reading of the statute would create new policy among several choices — especially when those policy choices implicate constitutional rights. Where a number of choices are available, judicial (or agency) statutory restructuring necessarily implicates "troublesome policy considerations which should in the first instance be dealt with by our Legislature rather than this Court." *State v. Rosenfeld*, 303 A.2d 889, 894 (N.J. 1973). For these reasons, we find unavailing the State's argument that promulgation of the challenged regulation was necessary to avoid a constitutional challenge to the statute.

¶ 11. Moreover, even if we were inclined to uphold the challenged regulation and, in effect, allow DMV to rewrite § 304(d), we would not do so here. From the beginning, Martin's position has been that the amended regulation is inconsistent with § 304(d). For the first time on appeal — and only in response to the State's constitutional necessity defense — Martin argues that both the amended regulation and § 304(d) are unconstitutional. Because these arguments were not raised before the superior court, they are not preserved for review here. See *Jakab v. Jakab*, 163 Vt. 575, 581, 664 A.2d 261, 264 (1995) ("Even with respect to constitutional claims, we ordinarily require that the issue on appeal be raised below.").

¶ 12. Absent a squarely presented constitutional challenge, we decline to make an unchartered foray into an unsettled area of constitutional law. Compare *Lewis v. Wilson*, 253 F.3d 1077, 1080-81 (8th Cir. 2001) (statute that agency relied upon in rejecting "ARYAN-1" plate as contrary to public policy violated First Amendment), *cert. denied*, 535 U.S. 986 (2002); *Pruitt v. Wilder*, 840 F. Supp. 414, 417-18 (E.D. Va. 1994) (DMV policy banning reference to deities violated First Amendment because it regulated speech in nonpublic forum based on viewpoint) with *Perry v. McDonald*, 280 F.3d 159, 163 (2d Cir. 2001) (applicant does not have First

Amendment right to vanity plates bearing letters "SHTHPNS"); *Kahn v. Dep't of Motor Vehicles*, 20 Cal. Rptr. 2d 6, 11-13 (Ct. App. 1993) (state has substantial interest in protecting its plates from degradation, and there was ample evidence that request would have been offensive to reasonable person).[6] Notably, the United States Supreme Court has not addressed a First Amendment challenge pertaining to vanity plates, and, as the dissent repeatedly points out, its law on viewpoint neutrality is not a model of clarity. See, e.g., *Pruitt*, 840 F. Supp. at 417-18 (discussing viewpoint neutral analysis in *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993)).

¶ 13.  In short, the situation presented here — no direct constitutional challenge and no definitive or controlling law in this area — is not one that tempts us to bypass our normal rule requiring that issues be preserved for appeal. Cf. *In re Sealed Documents*, 172 Vt. 152, 156, 772 A.2d 518, 523 (2001) (our tradition of addressing issues of constitutional significance only when they are "squarely and necessarily presented counsels restraint and forbearance" as to broader First Amendment questions); *Herald Ass'n, Inc. v. Ellison*, 138 Vt. 529, 533, 419 A.2d 323, 326 (1980) (although First Amendment appears to be implicated, decisions of United States Supreme Court do not clearly determine whether First Amendment violation exists; in face of such uncertainty, "the wisdom of our traditional rule of self-restraint — that we do not needlessly decide constitutional issues — is all the more apparent" (internal citations omitted)).

## II.

¶ 14. Although we find unavailing the State's argument that promulgation of the challenged regulation was constitutionally necessary, we recognize that an expansive administrative reading of § 304(d) is of

---

[6] The dissent seems to suggest that DMV's regulation was compelled by federal case law — in particular, *Perry v. McDonald*, 280 F.3d 159 (2d Cir. 2001). The dissent's reliance on *Perry* is misplaced. In that case, the Second Circuit Court of Appeals held that the Vermont vanity plate applicant did not have a First Amendment right to use vanity plates bearing the letters "SHTHPNS." *Id.* at 163. In rejecting the applicant's argument that the State had engaged in viewpoint discrimination by allowing plates referencing "cute" scatological terms while rejecting his request, the court emphasized that § 304(d) concerns "*offensive* scatological terms, not just scatological terms." *Id.* at 170. According to the court, the difference between the applicant's request and others was not that the others were "cute," but rather that they did not include easily recognizable profanities, as did the applicant's. *Id.* As the court stated, the relevant difference between "shit" and "pooper" is that the former is a profanity, and therefore offensive. *Id.* at 170-71. Thus, *Perry* indicates what the court would have done with "MICK," not what it would have done with "IRISH." In any event, *Perry* certainly does not suggest that DMV's regulation is the only reasonable way for the agency to implement the Legislature's vanity program without running afoul of the First Amendment.

particular concern because the statute and the regulation implicate First Amendment protections. Where citizens' constitutional rights are concerned, we must be especially vigilant in assuring that elected officials — and not appointed administrators — are making policy. With this in mind, we now consider Martin's principal argument that the challenged regulation is inconsistent with, and thus beyond the authority provided by, § 304(d), its governing statute.

¶ 15. It is axiomatic that an administrative agency's power to promulgate regulations may extend only as far as its legislative grant of authority. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988); see *In re Vt. Gas Sys., Inc.*, 150 Vt. 34, 39, 549 A.2d 627, 630 (1988) ("An administrative agency's rule-making authority cannot support an expansive interpretation of its own powers."). Thus, while we generally presume the validity of regulations within the agency's authority, we will uphold an administratively adopted regulation only "where we can do so without compromising the intent of the statute which authorized it." *In re Agency of Admin.*, 141 Vt. 68, 74, 444 A.2d 1349, 1351-52 (1982); see *Vt. Ass'n of Realtors, Inc. v. State*, 156 Vt. 525, 530, 593 A.2d 462, 465 (1991) ("[W]e will not countenance any agency rule that exceeds the authority delegated to the agency under its enabling act."). If an agency operates outside the bounds, or for purposes other than those, authorized by the enabling legislation, "this Court will intervene." *In re Agency of Admin.*, 141 Vt. at 75, 444 A.2d at 1352.

¶ 16. The fundamental principle served by these tenets is the doctrine of separation of powers. See 1A N. Singer, Statutes and Statutory Construction § 31.06, at 544 (5th ed. 1993). Courts have generally upheld broad delegations of authority to administrative agencies, but agency action that "transcends the delegation will not be sustained." 1 J. Stein, G. Mitchell & B. Mezines, Administrative Law § 3.03[5], at 3-110 (2002). Confining delegated lawmaking authority within its intended bounds helps to assure that ultimate control over policymaking rests with the legislative branch of government rather than unelected administrative officials. 1 N. Singer, Statutes and Statutory Construction § 4.15, at 166 (5th ed. 1994); see *Chambers v. St. Mary's Sch.*, 697 N.E.2d 198, 202 (Ohio 1998) (legislative accountability is cornerstone of democratic process that justifies general assembly's role as lawmaker and restricts administrative rule-making to placing general assembly's policy into effect).

¶ 17. Here, the Legislature has given the Commissioner the general authority to assign a combination of numbers and letters for each registered motor vehicle, see 23 V.S.A. § 304(a), and to issue vanity plates and specialty plates for safety or service organizations, see *id.* § 304(b).

Under the statute, the Commissioner "shall issue" vanity plates "at the request of the registrant of any motor vehicle," except as otherwise provided. *Id.* § 304(b)(1). Section 304(d) provides that vanity plates "shall be issued" in any combination of seven or less numbers and letters that do not duplicate or resemble a regular-issue plate. The Commissioner may, however, refuse to honor or revoke "any request that might be offensive or confusing to the general public." *Id.* § 304(d).

¶ 18. Plainly, the Legislature intended to allow applicants to obtain vanity plates in any combination of seven or less numbers and letters, as long as the requested plate is not similar to a regular-issue plate, confusing to identify, or offensive. See *State v. Lussier,* 171 Vt. 19, 23, 757 A.2d 1017, 1020 (2000) ("Our primary duty in construing a statute is to discern the intent of the Legislature by examining the language of the entire statute, along with its purpose, effects, and consequences."). Put differently, the applicant gets what she wants unless the Commissioner, in her discretion, determines that the request would be offensive or confusing and hence incompatible with the official state function served by license plates.

¶ 19. The plain intent of the statute is revealed by closely examining the critical sentence at issue: "The commissioner may refuse to honor any request that might be offensive or confusing to the general public." Notably, the sentence does not give the Commissioner the discretion to refuse to honor any request — period. Rather, the Commissioner "may" refuse to honor only those requests that might be confusing or offensive. In other words, the Commissioner may *not* refuse to honor a request unless she determines that the request might be offensive or confusing. This point is further supported by the language in § 304(b) and (d) instructing that the Commissioner "shall issue" requested plates not found to be offensive, confusing, or otherwise outside the statutory criteria.

¶ 20. Rather than make categorical exclusions with respect to vanity plates, the Legislature has given the Commissioner the discretion to reject any "request" that might be offensive or confusing. The Legislature certainly knows how to exclude entire categories, as evidenced by § 304(b)(2)(C), which requires organizations applying for specialty plates to "present the commissioner with a name and emblem that is not obscene, offensive or confusing to the general public *and* does not promote, advertise or endorse a product, brand or service provided for sale, or promote any specific religious belief or political party." (Emphasis added.) The Legislature elected not to set forth categorical exclusions with respect to vanity plates, however.

■ ¶ 21. Nonetheless, the challenged regulation extends beyond the statutory language and permits the Commissioner to reject requests for vanity plates that are themselves inoffensive but belong in one of several designated categories that include words with the potential to offend. Indeed, in the case at bar, Martin's request for "IRISH" was refused, not because it might be offensive — there was no evidence or argument to that effect — but rather because it refers to ethnicity, a topic that would also include offensive ethnic slurs.

¶ 22. DMV's policy is not limited to ethnicity, however; it also applies to each of the other topics set forth in the challenged regulation. Plainly inoffensive requests such as "BLUE" (color), "GREEN" (color/political affiliation), or "ALLGIRLS" (gender) are excluded under the regulation without any determination that they are offensive. Names such as "ROSE," "SCARLET" and "VIOLET" are also excluded. These examples demonstrate that, by promulgating the challenged regulation, DMV is imposing its own policy with respect to vanity plate requests — one that is distinct from, and inconsistent with, the one adopted by the Legislature.

¶ 23. Under DMV's policy, certain topics the agency considers too sensitive are off limits, even if the individual "requests" within that subject area have no potential to offend. In effect, DMV has cut the statutorily required nexus between the denial of the plate and the potential to offend. I agree with the dissent that the Commissioner has considerable discretion to interpret § 304(d) in a way that is reasonable, but blanket regulations intended to prohibit the issuance of potentially offensive vanity plates cannot be characterized as reasonable when the result is to prohibit words such as "IRISH" or "BLUE."

¶ 24. DMV's promulgation of a regulation containing categorical exclusions of topics irrespective of their potential to offend was apparently prompted by a suit against DMV based on the agency's denial of a request for the plate "SHTHPNS." See *Perry v. McDonald*, 280 F.3d 159 (2d Cir. 2001). In defending DMV's decision in *Perry* — a determination made before the regulation at issue in this case was promulgated — the State relied on DMV's exercise of its authority to prohibit offensive plates through an unwritten policy of denying requests referencing scatological terms. In upholding the DMV's decision as reasonably serving legitimate governmental interests in a nonpublic forum, the Second Circuit Court of Appeals observed that § 304(d) "concerns *offensive* scatological terms, not just scatological terms." *Id.* at 170 (emphasis in original).

¶ 25. The new regulation excises the very nexus that the Second Circuit identified as critical — the link between DMV's denial of a request

and the request's potential to offend. A similar situation arose in *Carr v. Dir. of Revenue*, 799 S.W.2d 124 (Mo. Ct. App. 1990). There, the agency involved had rejected a request for "ARYAN-1" because it violated an agency regulation prohibiting any personalized license plates " 'containing or suggesting any profane, obscene, inflammatory or patently offensive word or phrase or otherwise conflicting with an overriding public policy.' " *Id.* at 126 (quoting Mo. Code Regs. tit. 12, § 10-23.100(6)). The car owner appealed, arguing that the regulation was contrary to its governing statute, which provided that " 'no plate shall be issued containing any profane or obscene word or phrase.' " *Id.* (quoting Mo. Rev. Stat. § 301.144). The court agreed, reversing the agency's decision because the regulation imposed additional restrictions beyond those set forth in the governing statute and thus was void in part. *Id.* The same reasoning applies here.

¶ 26. The State argues, however, that the Legislature, through the Legislative Committee on Administrative Rules, endorsed the approach taken by DMV in the amended regulation. The Committee minutes reveal that, at the first meeting in which the new regulation was reviewed, some of the Committee members expressed concerns about the additional restrictions imposed by the proposed regulation. The Committee decided to continue its review. Ultimately, at a later meeting, five members of the Committee elected not to object to the regulation, with one member dissenting.

¶ 27. The Committee's actions are hardly a ringing endorsement of the regulation. In any event, it is this Court, not the Committee, that must determine whether the challenged regulation is consistent with its governing statute. The Administrative Procedure Act (APA) requires that agencies file proposed rules with the Committee. 3 V.S.A. § 841(a). The Committee may object that the rule is arbitrary, beyond the authority of the agency, or contrary to the intent of the Legislature, and recommend that the agency withdraw or amend the proposal. 3 V.S.A. § 842(a)-(b). If the Committee objects to the rule, the burden is on the agency, in any action for judicial review or enforcement of the rule, to establish that the part of the rule objected to is not arbitrary, outside the agency's delegated authority, or inconsistent with the intent of the Legislature. *Id.* § 842(b). "If the agency fails to meet its burden of proof, the court shall declare the whole or portion of the rule objected to invalid." *Id.* Thus, under the APA, the Committee has no authority to determine the validity of a proposed administrative regulation, but rather can indicate only whether it will object to the proposed regulation.

## III.

¶ 28.  Finally, the State argues that the challenged regulation is a valid exercise of DMV's authority because it is administratively necessary. Again, we find this argument unpersuasive. Agencies generally may not choose to ignore "their statutory mandate because they believe it is administratively inefficient or infeasible." *Campbell v. United States Dep't of Agric.*, 515 F. Supp. 1239, 1249 (D.D.C. 1981) (agency cannot decide not to allow food stamp recertifications at Social Security offices because of practical problems they perceive in doing so).

¶ 29.  In very limited circumstances, "administrative necessity may be a basis for finding implied authority for an administrative approach not explicitly provided in the statute." *Ala. Power Co. v. Costle*, 636 F.2d 323, 358 (D.C. Cir. 1979). A court may uphold streamlined agency approaches or procedures involving categorical exemptions not explicitly provided by statute when a case-by-case approach would, as a practical matter, prevent the agency from carrying out its legislatively authorized mission. *Id.* But the agency's burden to justify its actions "in such a case is especially heavy." *Id.* at 359.

¶ 30.  The State has not met that heavy burden here. Cf. *Pub. Citizen, Inc. v. Shalala*, 932 F. Supp. 13, 17 (D.D.C. 1996) (FDA failed to demonstrate administrative impossibility of applying statute's nutrition content and health claim provisions to restaurant menus). There is no evidence that DMV could not carry out its statutory mandate without imposing overbroad categorical exclusions that sever the statutory nexus between the denial and the offensiveness of the requested plate.

¶ 31.  In support of its administrative necessity argument, the State states simply that the Commissioner would be unable to handle the growing number of special plate applications without regulatory standards to implement the program. We do not suggest otherwise. DMV may promulgate regulations consistent with the statute, and, in doing so, may establish lists of combinations of numbers and letters that might be offensive. DMV may also, consistent with § 304(d), exclude entire categories comprised exclusively of words that might offend the general public. Cf. *McMahon v. Iowa Dep't of Transp.*, 522 N.W.2d 51, 55-57 (Iowa 1994) (upholding regulation disallowing combinations of numbers and letters that have sexual connotations or that are defined in dictionaries as terms of vulgarity, contempt, prejudice, hostility, insult, or racial or ethnic degradation); *Higgins v. DMV*, 13 P.3d 531, 533 n.3-4 (Or. Ct. App. 2000) (en banc) (construing regulation defining "ethnic words" as words that refer to definable class of persons, and that ridicule or support superiority of that class). The agency may not, however, claim the

authority to establish policy unauthorized by statute solely because the task is fraught with difficulty. If the Legislature has set DMV "with an impossible task, their remedy is with [the Legislature] and not this Court." *Campbell*, 515 F. Supp. at 1249.

## IV.

¶ 32. In sum, we conclude that the amended regulation may not support the decision to deny the "IRISH" plate in that it "prescribes a standard which [the Legislature] has not authorized the Commissioner . . . to fix." *Lynch v. Tilden Produce Co.*, 265 U.S. 315, 321 (1924); see *Milette v. N.H. Ret. Sys.*, 683 A.2d 531, 534 (N.H. 1996) ("The legislature's grant of rulemaking authority to an agency is not a grant of power to change or modify statutory law by regulation."). We do not underestimate the challenge of crafting a vanity plate program that balances administrative efficiency with First Amendment concerns. But the response to that challenge cannot circumvent the branch of government responsible for making the law. That responsibility and authority resides in the Legislature, not the Department of Motor Vehicles.

¶ 33. Concerned about the possibility of future litigation, the dissent would have us instruct the administrative agency on how to carry out its legislative mandate. The dissent's prediction that the vanity plate program will continue to be litigated is a safe one, given the uncertain state of federal law on forum analysis and viewpoint neutrality. The issue in this case, however, is whether DMV's regulation is unauthorized by the governing statute. We do not question the difficulty of promulgating a vanity plate program predicated on a statute that requires a nexus to offensiveness. The agency's removal of entire categories of subjects may be one way through the constitutional thicket of viewpoint analysis. But the agency's approach must be authorized by the governing statute. The current regulation fails to satisfy that requirement.

*The Department of Motor Vehicle's Rule 16 I.(f)(4) is stricken, and the superior court's April 19, 2001 decision is reversed.*

¶ 34. **Johnson, J.,** dissenting. In implementing the vanity plate program, DMV found itself caught between a rock and a hard place. On the one hand, the agency was empowered to deny "*any* [vanity plate] request that *might be* offensive or confusing to the general public." 23 V.S.A. § 304(d) (emphasis added). On the other hand, federal courts interpreting the First Amendment hold that government restrictions on speech that discriminate on the basis of viewpoint are unconstitutional.

The agency had to develop a method of implementing the vanity plate program that would enable it to refuse potentially offensive plate applications yet would not be arbitrary or appear to discriminate on the basis of viewpoint. Put plainly, the Commissioner had to avoid the viewpoint discrimination that would result if she allowed "IRISH" but rejected "NOIRISH" or "MICK." Promulgating a regulation that banned certain topics altogether as potentially "offensive or confusing" was very likely the only reasonable way the agency could implement the Legislature's vanity plate program while complying with the statute and First Amendment requirements. This is what the trial court held, and it should be affirmed. I respectfully dissent.

¶ 35. The majority narrowly confines this case to a question of administrative law: whether the Commissioner of DMV, in prohibiting ethnic references on vanity plates, has promulgated a regulation in conflict with the statute, because the plate challenged here, "IRISH," cannot be considered offensive. Its premise is that the statute is unambiguous and therefore affords no discretion to the Commissioner to fill in the blanks, so to speak, even if the reason for filling in the blanks is to comply with the Constitution.

¶ 36. Where I depart from the majority is that it is hard for me to conceive of a more ambiguous statute than the one before us. The statute provides no definition for two key terms: "offensive" and "confusing." This Court has held that "words in a statute without definition are to be given their plain and commonly accepted use." *Shetland Props., Inc. v. Town of Poultney*, 145 Vt. 189, 194, 484 A.2d 929, 932 (1984) (internal quotations omitted). The words "offensive" and "confusing," however, are susceptible to a variety of meanings, and 23 V.S.A. § 304(d) allows the agency to reject requests that are *not* necessarily offensive or confusing, but *"might be."* The Commissioner, therefore, has considerable discretion to interpret the statute in a way that is reasonable. See *In re Smith*, 169 Vt. 162, 169, 730 A.2d 605, 611 (1999) ("[W]here a statute is silent or ambiguous regarding a particular matter this Court will defer to agency interpretation of a statute within its area of expertise as long as it represents a permissible construction of the statute."). See also *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001) (holding that when Congress intends for an agency to implement a statute in a way that risks unconstitutionality, the Court "expect[s] a clear indication that Congress intended that result. . . . [because of] our prudential desire not to needlessly reach constitutional issues and our assumption that Congress does not casually authorize administrative

agencies to interpret a statute to push the limit of congressional authority.").

¶ 37. When interpreting statutes, moreover, agencies are *required by law* to follow controlling judicial precedents. *Nat'l Labor Relations Bd. v. Ashkenazy Prop. Mgmt. Corp.*, 817 F.2d 74, 75 (9th Cir. 1987) ("Administrative agencies are not free to refuse to follow circuit precedent in cases originating within the circuit [without] good faith intention of seeking review of the particular proceeding by the Supreme Court."). Agencies must heed constitutional restrictions in part because reviewing courts will do so, and an agency that acts without considering the constitutional implications of its policy risks having the offending policy or regulation stricken following judicial review. Between a construction of the vanity plate statute that renders it constitutional and one that creates substantial constitutional doubt, "we are required to take the path that results in clear constitutionality." *Apache Survival Coalition v. United States*, 21 F.3d 895, 903 (9th Cir. 1994); see also *Blodgett v. Holden*, 275 U.S. 142, 148 (1927) ("[A]s between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the Act.") (Holmes, J., concurring).

¶ 38. The majority opinion envisions an exceedingly unwieldy system of administrative law, under which courts alone are allowed to consider constitutional principles and to "narrow the reach of a broadly-worded statute . . . to avoid serious questions of constitutionality." *In re G.T.*, 170 Vt. 507, 517, 758 A.2d 301, 308 (2000). If this framework were implemented literally, agencies would interpret statutes without considering constitutional limitations, and citizens whose fundamental rights were abridged would need to bring the offending agencies to court to vindicate their rights. The deficiencies in this unworkable system are exacerbated by the majority's position that it will find regulations invalid but it will never advise the agency on what regulation will be found valid. In the context of the particular statute before us today, the majority's opinion guarantees that we will see the legality of the state's vanity plate program litigated over and over again as the state experiments with different methods of drawing the line between offensive and nonoffensive, without any definitive guidance from this Court and with each line offensive to a different plaintiff.

¶ 39. I agree with the majority that an agency has no authority to choose an interpretation of a statute that is not reasonably available. See *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001) ("No matter how severe the constitutional doubt, courts may choose only between

reasonably available interpretations of a text."); *In re Agency of Admin.*, 141 Vt. 68, 74-75, 444 A.2d 1349, 1352 (1982) ("[C]onstruction of statutes by those charged with their execution will be followed unless there are compelling indications that the construction is wrong."). If the vanity plate statute had unambiguously directed that DMV reject *only* those applications for vanity plates that were *actually offensive*, DMV probably would not have been permitted to establish categorical prohibitions based on subject matter, as it has done. Unlike the agency in *American Trucking*, DMV is not interpreting a statute in a way that "contradicts what in our view is quite clear." 531 U.S. at 481. On the contrary, DMV regulation, at least insofar as it pertains to references to ethnicity, is a permissible interpretation of the vanity plate statute's prohibition on plates that might cause offense or confusion.

¶ 40. To the extent that the majority insists that the vanity plate statute must be construed as written without reference to authoritative constitutional decisions, the majority is advocating an approach to statutory construction that conflicts with the approach taken by the United States Supreme Court in construing state statutes imposing restrictions on free speech. In the context of a facial challenge to a state obscenity statute, the Supreme Court reads the statute in conjunction with authoritative state and federal decisions. In the absence of evidence to the contrary, the Supreme Court presumes that the state law will be applied in accordance with the limitations articulated by court precedents. The classic example of this analysis in the First Amendment context is the case *Ward v. Illinois*, 431 U.S. 767 (1977), where the United States Supreme Court upheld an Illinois obscenity statute that would have been unconstitutionally overbroad if it had not been construed to incorporate judicial precedents. An earlier case, *Miller v. California*, 413 U.S. 15, 24 (1973), had established a requirement that a state obscenity law "as written *or authoritatively construed*" (emphasis added) had to delineate with specificity the kinds of sexual conduct the description or representation of which the state intended to proscribe. In its *Ward* decision, the United States Supreme Court held that the Illinois statute was not unconstitutionally overbroad even though the statute on its face failed to identify specifically the kinds of sexual conduct the depiction of which was to be prohibited. *Ward*, 431 U.S. at 774-76. The Supreme Court found that because prior decisions of the Illinois Supreme Court incorporated the *Miller* guidelines into the obscenity statute, the Illinois statute was constitutional. *Ward*, 431 U.S. at 776-77.

¶ 41. I read *Ward* to stand for the proposition that rulings of federal courts and this Court are relevant to the appropriate construction of the

vanity plate statute. Authoritative judicial decisions are relevant and should guide an agency's discretion when interpreting a statute that is ambiguous. Of special relevance for Vermont's vanity plate program is a Second Circuit decision examining whether Vermont's vanity plate restrictions represent an unconstitutional prior restraint on speech. This decision, *Perry v. McDonald*, 280 F.3d 159, 169-70, 172-73 (2d Cir. 2001), holds that any speech restrictions in the context of vanity plates must be viewpoint neutral, supporting DMV's interpretation of the statute.

¶ 42. The decision in *Perry* makes clear that the free speech interests at stake in vanity plates are limited. "Because vanity plates are physically restricted by size and shape and by the state's interests, including that of vehicle identification, vanity plates are a highly limited and extremely constrained means of expression." *Id.* at 168. Nevertheless, whenever the government becomes involved in limiting expression in any way, First Amendment concerns become paramount. Federal courts have developed an analytical method known as "forum analysis" to determine what types of speech restrictions are permissible. Under forum analysis, all government property is classified as a nonpublic forum, a designated public forum, or a public forum. See, e.g., *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45-46 (1983); *Perry v. McDonald*, 280 F.3d at 166. Whether a speech restriction is permissible depends upon what kind of forum is in play.

¶ 43. The Second Circuit reviewed Vermont's vanity plate program in 2001, and concluded that Vermont vanity plates are a nonpublic forum, as opposed to a public forum, for the following reasons. *Perry v. McDonald*, 280 F.3d at 167. First, the stated goal of Vermont in issuing vanity plates, and all license plates, is to aid in vehicle identification. *Id.* Second, Vermont's vanity plate program is designed to earn revenue, not to provide Vermonters with a venue for public expression. *Id.* Third, expression on vanity plates is subject to many restrictions, such as limitations on the number of letters that can appear on a plate and the 23 V.S.A. § 304(d) provision allowing the Commissioner to deny a request for a special plate that might be considered "offensive or confusing to the general public." *Id.* at 167-68. Fourth, the statute requires that Vermonters obtain permission from the State to obtain a vanity plate, rather than allowing them to obtain a plate automatically. *Id.* at 166. Once vanity plates have been found to be a nonpublic forum, forum analysis defines what speech limits are tolerated by the Constitution. In a nonpublic forum, restrictions on expressive activity are allowed as long as

they are reasonable and viewpoint neutral. *Perry Educ. Ass'n,* 460 U.S. at 46; *Cornelius,* 473 U.S. at 800; *Perry v. McDonald,* 280 F.3d at 166.[7]

¶ 44.  The reasonableness standard is easily met in the case of vanity plates. The interest of the State in not alienating members of the public who see government property being used to send a message they find offensive or confusing is sufficient. Because the vanity plate restrictions do not prevent motor vehicle owners from communicating messages on their automobiles through the use of bumper stickers, the State can demonstrate that the regulation is reasonably "directed not to suppressing, but to disassociating the [state] from, [plaintiff's] speech." *Gen. Media Communications, Inc. v. Cohen,* 131 F.3d 273, 281 n.10 (2d Cir. 1997); see also *Perry v. McDonald,* 280 F.3d at 169-70.

¶ 45.  Having found the regulation reasonable, viewpoint neutrality is left as the principal limitation on the government's discretion to limit speech in a nonpublic forum.[8] See L. Jacobs, *The Public Sensibilities*

---

[7] If I were writing at a time before nonpublic forum analysis became an entrenched part of First Amendment case law, I would not impose the First Amendment protections that the Second Circuit and the United States Supreme Court have determined are necessary for a nonpublic forum upon Vermont's vanity plate program. The vanity plate program is the State's program, aimed at making money and identifying vehicles, not at providing a forum for meaningful speech. As the Second Circuit stated, "[a]utomobile license plates are governmental property intended primarily to serve a governmental purpose, and inevitably they will be associated with the state that issues them. . . . The state has a legitimate interest in not communicating the message that it approves of the public display of offensive . . . terms on state license plates." *Perry v. McDonald,* 280 F.3d at 169. Accord *Higgins v. DMV,* 13 P.3d 531, 534 (Or. Ct. App. 2000) (en banc) ("[T]he opportunity to propose a message does not change the fact that the plates constitute a state communication for a state purpose . . . ."). Moreover, I do not find the speech interest compelling because prohibiting a term on a vanity plate does not prevent vehicle owners from conveying the same message through a bumper sticker affixed to their car. Bumper stickers have historically provided Vermonters with a much more expressive forum than vanity plates, and Vermonters have shown no reluctance to use them to make humorous, political, and religious statements. For a thoughtful analysis of the limits of such a "public sensibilities forum," see L. Jacobs, *The Public Sensibilities Forum,* 95 Nw. U. L. Rev. 1357, 1436 (2001) (proposing that in contexts such as vanity plates where the government is creating a speech opportunity and an unwilling audience will likely view the resulting communication, the government and the public it serves should not be required to tolerate "the same range of 'outrageous' speech" that they must in other contexts as long as appropriate procedural safeguards are implemented).

[8] Appellant cites *R. A. V. v. City of St. Paul,* 505 U.S. 377, 382 (1992), for the proposition that "[c]ontent-based regulations are presumptively invalid," but this case is not on point because it does not involve a nonpublic forum. Cf. *Cornelius,* 473 U.S. at 800 (noting that "the Court has adopted a forum analysis as a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes" and that "[a]ccess to a nonpublic forum . . . can be

*Forum*, 95 Nw. U. L. Rev. 1357, 1371-72 (2001). Viewpoint neutrality is a difficult hurdle for the government, and it is concern with meeting this requirement that led DMV to issue the regulation banning all ethnic terms that is at issue in this case.

¶ 46. The Second Circuit has interpreted viewpoint neutrality as permitting the government to prohibit speech on a particular subject, as long as the government does not prohibit the expression of particular views about otherwise permissible subjects. *Perry v. McDonald*, 280 F.3d at 170 (explaining that "the government may reasonably restrict expressive activity in a nonpublic forum on the basis of content, but not on the basis of the speaker's viewpoint").[9] See also *Lebron v. Nat'l R.R. Passenger Corp.*, 69 F.3d 650, 658-59 (2d Cir. 1995) (upholding Amtrak's categorical ban on political advertising on an Amtrak-owned billboard as permissible because ban covers entire subject rather than being used to screen out only certain views). Although categorical bans have been held to be viewpoint neutral, the line between viewpoint regulation and content regulation is not always clear. The Supreme Court has noted that viewpoint regulation is an impermissible form of content discrimination, suggesting that there is no "either-or" distinction but, instead, that certain types of content restrictions are unlawful as viewpoint discrimination.

---

restricted as long as the restrictions … [are] not an effort to suppress expression merely because public officials oppose the speaker's view." (internal quotations omitted)).

[9] The majority emphasizes the parts of the *Perry v. McDonald* decision recognizing § 304(d)'s reference to "offensive" plates. It asserts that nothing in *Perry v. McDonald* precludes the agency from including offensiveness among the criteria for rejecting plates. I agree that the Second Circuit does not pass judgment on exactly how DMV must interpret its vanity plate regulation to ensure that the regulation passes constitutional muster in cases less egregious then a license plate bearing a profanity. *Perry v. McDonald* is unwavering, however, in its insistence that in a nonpublic forum such as state-issued vanity plates, Vermont cannot restrict expression on the basis of viewpoint. *Perry v. McDonald*, 280 F.3d at 167, 169-70, 172-73. So the question becomes, how does DMV figure out what policies would ensure that it does not engage in unconstitutional viewpoint-based discrimination? *Perry v. McDonald* is not the end of the story and does not control the outcome of this case. What it does do is provide DMV with a legal basis for interpreting its vanity plate regulations in a way that is intended to conform as closely as possible with existing case law on viewpoint neutrality. Whether DMV has an adequate basis for the regulation is subject to review by state courts, as we are asked to do today. Because I find that free speech considerations are inextricably intertwined with the issues at stake in this case, I would recognize DMV's obligation to look at decisions such as *Perry v. McDonald* as it develops its vanity plate regulatory program for judicial guidelines on what is meant by viewpoint neutrality. While *Perry v. McDonald* does suggest that DMV may consider "offensiveness" in distinguishing between "cute" scatological terms and profanities, *id.* at 169, 170-71, the regulation on ethnicity approaches much more sensitive areas of speech, bound up with identity, and thus the ability of the agency to consider "offensiveness" in this context while maintaining viewpoint neutrality is more doubtful.

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is . . . an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

¶ 47.   As the majority in *Rosenberger* observed, the distinction between content and viewpoint discrimination "is not a precise one." *Id.* at 831. This imprecision makes for unclear law, inconsistent decisions, and as the case before us today demonstrates, creates uncertainty about the constitutionality of government programs. Nowhere is the murkiness of the term viewpoint neutrality more apparent than in a review of case law involving vanity plates where state governments have unsuccessfully tried to defend rules restricting plate content. See *Lewis v. Wilson*, 253 F.3d 1077, 1080-82 (8th Cir. 2001) (striking Missouri statute prohibiting plates that are "contrary to public policy" as discriminating on the basis of viewpoint and ordering state to issue ARYAN plate); *Sons of Confederate Veterans, Inc. v. Holcomb*, 129 F. Supp. 2d 941, 946 (W.D. Va. 2001) (finding impermissible viewpoint-based discrimination in a Virginia statute that had prevented the Sons of Confederate Veterans from placing their logo, which incorporates the Confederate battle flag, on a specialty license plate); *Pruitt v. Wilder*, 840 F. Supp. 414, 417-19 (E.D. Va. 1994) (ordering state to issue "GODZGUD" plate despite ban on references to deities because barring references to deities while allowing other types of religious speech discriminates on the basis of the speaker's viewpoint).

¶ 48.   None of these vanity plate decisions provides a clear definition for the term "viewpoint discrimination."[10] Two general principles can be gleaned from them, however, about the factors that courts look to as indications of possible viewpoint neutrality violations. First, the more specific a prohibition is within a broad category, the more likely it is to be viewpoint discrimination instead of a permissible content restriction (i.e., religious speech can be banned entirely, but references to deities only has been found to violate viewpoint neutrality). Second, the government must

---

[10] Nor can a clear definition be found in the United States Supreme Court's nonpublic forum jurisprudence. The Supreme Court has split repeatedly over the proper application of the requirement of viewpoint neutrality since the concept was introduced as the required standard for a nonpublic forum. See *Perry Educ. Ass'n*, 460 U.S. at 49, 64-65 (5-4 decision) (split over whether discrimination on the basis of the identity of speaker constitutes viewpoint discrimination); *Rust v. Sullivan*, 500 U.S. 173, 194, 209 (1991) (5-4 decision) (split over whether gag rule imposed on recipients of federal funding was viewpoint discrimination); *Rosenberger*, 515 U.S. at 831, 893 (5-4 decision) (split over whether denial of subsidies by a public university to a religious student organization is impermissible viewpoint discrimination).

provide procedural protections to ensure that its agencies do not engage in viewpoint discrimination.

¶ 49. The term "viewpoint neutral" is probably a source of more confusion than clarity in judicial decisions. Nevertheless, my reading of the case law leads me to conclude that DMV's regulation banning all references to ethnicity on vanity plates meets the test for viewpoint neutrality. The regulation provides a crystal-clear standard for DMV staff to use in evaluating plate applications, preventing possible bias towards one ethnicity or another by banning them all. The motivation for the ban is not to insult a particular ethnicity but simply to take a controversial area of discourse off of state-issued license plates. By banning all references to ethnicity, the agency has ensured that decisions will not be arbitrary or viewpoint-based.

¶ 50. The majority never proposes a method that DMV could use to evaluate vanity plates that would both ensure that all rejected plates were "offensive" (in whatever sense the Legislature intended in § 304(d)) *and* ensure viewpoint neutrality. The majority proposes that DMV "may establish lists of combinations of numbers and letters that might be offensive . . . [and] exclude entire categories comprised exclusively of words that might offend the general public." *Ante*, at ¶ 31. The majority's proposal effectively throws viewpoint neutrality out the window. Any list would reflect the viewpoint of its makers as to where to draw the lines in terms of what terms are ethnic insults and what terms are positive expressions of pride.

¶ 51. The Legislature has not specifically indicated to DMV that it wishes the agency to ignore the First Amendment in implementing the vanity plate program. Given the requirements of viewpoint neutrality, DMV was justified in promulgating a regulation that took certain categories containing *potentially offensive* terms off the table.

¶ 52. I am authorized to state that Justice Dooley joins in this dissent.